KOSCOT INTERPLANETARY, INC., Appellant, *v.*
DALE DRANEY and LEE PETERS, Respondents.

No. 6930

December 23, 1974                    530 P.2d 108

*Laxalt, Berry and Allison,* of Carson City, for Appellant.

*Robinson and Cassas,* of Reno, for Respondents.

*Robert List,* Attorney General, *Elliot A. Sattler* and *Donald Klasic,* Deputy Attorneys General, Amicus Curiae.

# OPINION

By the Court, BATJER, J.:

The appellant, Koscot Interplanetary, Inc. (Koscot), qualified to do business in the State of Nevada and at the time this controversy arose was engaged in the sale of cosmetics.

The Koscot cosmetics products are manufactured exclusively in Koscot's plant. The expansion and growth of Koscot is built upon a scheme for the sale of positions with the company, which sales authorize individuals to sell not only the cosmetic products but also additional positions with the company. When a person purchases a sales position with Koscot, the one instrumental in selling him the position receives a percentage of all amounts the new recruit pays into the company for his position and for merchandise.

At the time this action arose there were three groups of persons holding positions in the company in Nevada. The persons in the first group are called beauty advisors, and they handle retail sales of cosmetics, usually on a door-to-door basis. The second group consists of beauty supervisors, and they may enlist one or more beauty advisors to work under them. The third group are distributors, and they supply their supervisors who in turn supply the beauty advisors with cosmetics. The supervisors whom they supply are persons recruited by the distributors under whom they work.

A supervisor receives a 15 percent commission on the gross sales of all his beauty advisors and there is no limitation placed on the number of such recruits he may bring into the company. A distributor receives a 10 percent commission on the gross sales of the supervisors he recruits and a 25 percent commission on the gross sales of all beauty advisors he recruits. Each new recruit is required to pay a certain sum of money into the company to obtain his or her position with the company and receives a certain amount of merchandise for resale. A beauty advisor pays no fee. A new supervisor pays $2,000 to the company and receives in return the right to and benefits of recruiting beauty advisors plus $2,000 in merchandise, based on company prices. A new distributor pays $5,000 to the company and receives in return the right to and benefits of recruiting both supervisors and beauty advisors plus $3,000 in merchandise. A recruiting bonus is

earned as each new recruit is brought into the organization plus a commission on the merchandise order the recruit must place with the company.

A standard training manual called "The Distributor's Training Manual"[1] is published and distributed on a national basis by Koscot to instruct its beauty advisors, supervisors and distributors on how meetings should be structured and handled to recruit new positions with the company. (This manual was received as an exhibit in this case.) Recruitment meetings are referred to in the manual as "Golden Opportunity Meetings." Prospective recruits are brought to these meetings as guests, and on the basis of a mathematical progression of earnings said to be possible through recruitment and sales of positions with the company, these guests are indoctrinated by means of illustrations in the manual and sold positions. At these meetings the company executives explain, in glowing terms, the organizational structure and profit potential of this unique marketing system in which each person profits from his own sales and from the sales of future recruits. Mathematical examples based upon average ability to recruit others into the system are used to show how profits may multiply geometrically as the organizational structure grows and pyramids. The training manual indicates the recruits are to be told a distributor can reap tremendous profits without ever selling a single cosmetic product to a consumer if he concentrates on recruitment. The respondents were introduced to Koscot through a "Golden Opportunity meeting" substantially similar to the meeting described in the manual, and they have purchased a distributorship and paid therefor the sum of $5,000.

A distributor in the Koscot marketing plan is entitled, in addition to cosmetic products equal to his investment based on company prices, to the right to attend training seminars and to recruit other distributors or beauty supervisors, and if a new distributor or beauty supervisor is brought into the

---

[1] Glenn W. Turner, the chairman of the board of directors of Koscot, and the organizer of the company, who is prominently mentioned in the training manual as a "sharecropper on his way to harvest the world," and Koscot, have received nationwide recognition in the reported court decisions. See State ex rel. Sanborn v. Koscot Interplanetary, Inc., 512 P.2d 416 (Kan. 1973); People ex rel. Kelley v. Koscot Interplanetary, 195 N.W.2d 43 (Mich.App. 1972); State ex rel. Morgan v. Dare To Be Great, 189 S.E.2d 802 (N.C. 1972); Frye v. Taylor, 263 So.2d 835 (Fla.App. 1972); Kugler v. Koscot Interplanetary, Inc., 293 A.2d 682 (N.J. Super. 1972); State ex rel. Turner v. Koscot Interplanetary, Inc., 191 N.W.2d 624 (Iowa 1971); Koscot Interplanetary, Inc. v. King, 452 S.W.2d 531 (Tex.Civ.App. 1970); Thaxton v. Commonwealth, 175 S.E.2d 264 (Va. 1970).

Koscot marketing plan, a commission is earned in the following amounts: (a) distributor recruited earns a $2,650 bonus; and (b) beauty supervisor recruited earns a $650 bonus.

The parties have stipulated that the products sold and distributed by Koscot are of good quality equal to competitively priced products, and that it has a self-imposed quota of one distributorship for each 7,000 of the population in the State of Nevada. However, the prospect is not told that the number of distributorships available in any designated geographical area within the state is unlimited.

On April 19, 1971, Chapter 375, 1971 Statutes of Nevada (NRS 598.100 to 598.130 inc.),[2] hereinafter referred to as Chapter 375, became effective, prohibiting pyramid promotional sales and endless chains, fixing a penalty, providing for

[2]NRS 598.100 to 598.130, inclusive, reads as follows:
"598.100  For the purposes of NRS 598.100 to 598.130, inclusive:
"1.  'Compensation' does not mean payment based on sales of goods or services to persons who are not participants in a pyramid promotional scheme or endless chain and who are not purchasing in order to participate in such a program.
"2.  'Person' includes a company, partnership, association or corporation and its employees, as well as a natural person.
"3.  'Promotes' means inducing one or more other persons to become a participant in a pyramid promotional scheme or endless chain.
"4.  A 'pyramid promotional scheme' means any program or plan for the disposal or distribution of property and merchandise or property or merchandise by which a participant gives or pays a valuable consideration for the opportunity or chance to receive any compensation or thing of value in return for procuring or obtaining one or more additional persons to participate in the program, or for the opportunity to receive compensation of any kind when a person introduced to the program or plan by the participant in such a program."
"598.110  Every person who contrives, prepares, sets up, proposes, operates, advertises or promotes any pyramid promotional scheme or endless chain is guilty of a misdemeanor."
"598.120  All contracts and agreements, existing or made in the future, which have any part of the consideration given for the right to participate in a pyramid promotional scheme or endless chain as defined in NRS 598.100 to 598.130, inclusive, are against public policy and voidable by a participant."
"598.130  In addition to any other relief available under NRS 598.100 to 598.130, inclusive:
"1.  The attorney general or any district attorney may commence an action in the district court having jurisdiction of the area where a pyramid promotional scheme or endless chain is being prepared, operated or promoted to enjoin or obtain any other equitable relief to prevent the further preparation, operation, promotion or prosecution of such scheme or chain. In addition to the relief authorized by this section, the court may award reasonable attorneys' fees and costs in any action brought under this section.
"2.  The attorney general or any district attorney may petition the

injunctive relief and declaring that all contracts and agreements, existing at that time or made in the future, which had formed any part of the consideration given for the right to participate in a pyramid promotional scheme or endless chain, were against public policy and voidable by a participant.

The respondents each purchased their distributorships from Koscot before Chapter 375 became effective. On April 23, 1971, a few days after the effective date, respondents made a demand in writing upon Koscot requesting the return of their investments. Koscot refused and respondents then filed their complaint which was answered by Koscot. The respondents' complaint contained two separate causes of action. The first cause of action alleged fraudulent misrepresentation, and the other, relying on NRS 598.120, sought to avoid and rescind their contracts with Koscot and a return of all consideration paid for the distributorships. Respondents then filed a motion for summary judgment on their second cause of action.

After both parties had filed memoranda of points and authorities, presented oral argument and submitted an agreed statement of facts, the district court concluded: that the marketing plan of Koscot was a pyramid promotional scheme as defined in NRS 598.100; that the contracts entered into between the respondents and Koscot were voidable by respondents; and, that they were entitled, as a matter of law, to a judgment on their second cause of action.

Pursuant to the provisions of NRCP 54(b), the district court expressly determined that there was no just cause for delay and entered a final judgment in the amount of $5,000, together with interest and costs in favor of each respondent and against Koscot. This appeal followed.

In ordering summary judgment for respondents, the district

district court having jurisdiction of the area where a pyramid promotional scheme or endless chain is being prepared, operated or promoted to appoint receivers to secure and distribute in an equitable manner any assets received by any participant as a result of such scheme or program. Any such distribution shall effect, to the extent possible, reimbursement for uncompensated payments made to become a participant in the scheme. In any such action, the court may, in addition to any other relief or reimbursement, award reasonable attorneys' fees and costs.

"3. The attorney general may commence a proceeding in quo warranto pursuant to the provisions of chapter 35 of NRS against a corporation which contrives, prepares, sets up, proposes, operates, advertises or promotes any pyramid promotional scheme or endless chain, such act or acts being hereby declared an act or acts which amount to a surrender or a forfeiture of its corporate rights, privileges and franchises."

court concluded that Chapter 375 was not an unreasonable or arbitrary exercise of police power by the legislature, nor was it in violation of Section 10, Article I, United States Constitution,[3] or Section 15, Article 1 of the Nevada Constitution.[4]

Koscot assigns these conclusions as error on the part of the district court. It also contends that Chapter 375 not only impairs the obligation of contract but is so vague and indefinite as to be unconstitutional, and that by preventing appellant from fairly conducting its business deprives it of due process of law.

Our legislature is free to enact any law provided it is not clearly prohibited by some provision of the Constitution of the United States or the Nevada Constitution. Whether a legislative enactment is wise or unwise is not a determination to be made by the judicial branch. Every reasonable presumption must be indulged in support of the controverted statute with any doubts being resolved against the challenging party, who has the substantial burden of showing that the act is constitutionally unsound. Cummings v. City of Las Vegas, 88 Nev. 479, 499 P.2d 650 (1972); Ex parte Philipie, 82 Nev. 215, 414 P.2d 949 (1966); Viale v. Foley, 76 Nev. 149, 350 P.2d 721 (1960); King v. Board of Regents, 65 Nev. 533, 200 P.2d 221 (1948); Ex parte Iratacable, 55 Nev. 263, 30 P.2d 284 (1934); Weaver v. Palmer Bros. Co., 270 U.S. 402 (1926).

Statutes, if enacted in the exercise of police power, are presumed to promote the public welfare and they come to court with the presumption of validity. Viale v. Foley, supra; Caton v. Frank, 56 Nev. 56, 44 P.2d 521 (1935).

It is not only a right but the duty of a state to protect its citizens from injurious activities in commercial and business affairs by regulation through its police power. Viale v. Foley, supra. Even a legitimate occupation may be restricted or prohibited in the public interest, and contracts adversely affecting that interest may be restrained. State ex rel. Sanborn v. Koscot Interplanetary, Inc., 512 P.2d 416 (Kan. 1973); Breard v. Alexandria, 341 U.S. 622 (1951); Frisbie v. United States,

---

[3]Art. I, § 10, United States Constitution: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts, . . ."

[4]Art. 1, § 15, Nevada Constitution: "No . . . law impairing the obligation of contracts shall ever be passed. . . ."

157 U.S. 160 (1895). See also, Railway Express Agency v. New York, 336 U.S. 106 (1949); Daniel v. Family Security Life Ins. Co., 336 U.S. 220 (1949); Nebbia v. New York, 291 U.S. 502 (1934).

In furtherance of this obligation to protect its citizens a state has the power to prevent fraud against the public in the conduct of an otherwise lawful business. State ex rel. Sanborn v. Koscot Interplanetary, Inc., supra; State v. Boyenger, 509 P.2d 1317 (Idaho 1973); State v. Guyette, 102 A.2d 446 (R.I. 1954). The reasonable and legitimate purpose of Chapter 375 is to prevent fraud against the public. Cf. State v. Redman Petroleum, 77 Nev. 163, 360 P.2d 842 (1961).

Appropriate regulation or prohibition may be reasonably imposed against pyramid promotional schemes deemed by the legislature to be injuriously fraudulent. Koscot's marketing plan viewed in the most favorable light is nothing but a fraudulent scheme to extract money from investors through the use of exaggerated claims and statistics, misrepresented as well as undisclosed facts and false advertising. Its emphasis is upon the sale of distributorships. The sale of cosmetics is only a facade.

NRS 598.120 declaring contracts and agreements embracing pyramid promotional merchandise sales schemes to be against public policy and voidable, is not constitutionally impermissible, does not unreasonably infringe upon Koscot's right to do business and is reasonably related to preventing fraud against the public which is the end to be achieved. See State ex rel. Sanborn v. Koscot Interplanetary, Inc., supra; State ex rel. Turner v. Koscot Interplanetary, Inc., supra.

We must now determine whether NRS 598.120 imposes an unconstitutional impairment on the obligation of contract. That statute not only declares that all future contracts and agreements which have any part of the consideration given for the right to participate in a pyramid promotional scheme are against public policy and voidable by a participant, but it also declares that all existing contracts and agreements having any part of the consideration for such right are also against public policy and voidable.

Although contracts previously entered into may be affected thereby, the constitutional interdiction against the impairment of the obligation of contract does not prevent a state in the

reasonable exercise of its police power from enacting laws intended to benefit the public. Individuals, by entering into contracts, may not estop the legislature from enacting laws for the public good.[5] Manigault v. Springs, 199 U.S. 473, 480 (1905).

Unquestionably, for future contracts the provisions of NRS 598.120 would be effective. We think that statute is equally effective as to the existing contracts between Koscot and respondents notwithstanding the provisions of Article I, Section 10 of the United States Constitution and Article 1, section 15 of the Nevada Constitution. This is so because any right which Koscot may have had to induce respondents to participate in a pyramid promotional scheme was subject to the paramount police power of this State. When Koscot entered into the agreements with respondents it did so subject to any regulating legislation which the State might enact to protect its citizens.

In Home Bldg. & L. Assn. v. Blaisdell, 290 U.S. 398, 442–444 (1934), the United States Supreme Court reiterated the rule that all contracts are made subject to the paramount authority retained by a state over contracts "to safeguard the vital interest of its people" and went on to say: "[T]he question is no longer merely that of one party to a contract as against another, but of the use of reasonable means to safeguard the economic structure upon which the good of all

---

[5]In the following cases the United States Supreme Court held that contracts could not so estop legislatures:

A recording act upheld as applying to deeds dated before the passage of the act [Jackson v. Lamphire, 28 U.S. 280 (1830)]; lottery tickets, valid when issued, were necessarily invalidated by legislation prohibiting the lottery business [Stone v. Mississippi, 101 U.S. 814 (1880)]; contracts for the sale of beer, valid when entered into, were nullified by a State prohibition law [Beer Co. v. Massachusetts, 97 U.S. 25 (1878)]; contracts of employment were modified by later laws regarding the liability of employers and workmen's compensation [New York Central R. R. Co. v. White, 243 U.S. 188 (1917)]; a contract between a plaintiff and defendant did not prevent the State from making the latter a concession which rendered the contract worthless [Manigault v. Springs, supra]; a contract for the conveyance of water beyond the limits of a State did not prevent the State from prohibiting such conveyance [Hudson Water Co. v. McCarter, 209 U.S. 349 (1908)]; a contract as to rates between two railway companies did not prevent the State from imposing different rates [Portland Ry. Co. v. Oregon R. R. Comm., 229 U.S. 397 (1913)]; nor did a contract between a public utility company and a customer protect the rates agreed upon from being superseded by those fixed by the State [Midland Co. v. K. C. Power Co., 300 U.S. 109 (1937)].

depends. * * * The principle of this development is, * * * that the reservation of the reasonable exercise of the protective power of the States is read into all contracts. * * *"

Koscot argues that Home Bldg. & L. Assn. v. Blaisdell, supra, involved an emergency situation and since no emergency exists here, police powers cannot be relied upon to overcome the unconstitutional nature of the statute. This argument was answered by the High Court in Veix v. Sixth Ward Bldg. & L. Assn. of Newark, 310 U.S. 32, 39 (1940), where it recalled its reasoning in *Blaisdell* that: "Emergency does not create [constitutional] power, emergency may furnish the occasion for the exercise of power," and held that if a legislature could enact statutes to protect the public in an emergency there was no reason why it could not enact permanent protective legislation.

In Treigle v. Acme Homestead Association, 297 U.S. 189 (1936), the High Court pointed out that where the police power is exercised "for an end which is in fact public" contracts must yield to the accomplishment of that end. The control of pyramid promotional schemes is "an end which is in fact public."

Although Koscot has leveled its attack against Chapter 375 in its entirety, the summary judgment was only granted under the provisions of NRS 598.120, and the breadth of this appeal is thereby limited.

The trial court specifically found the marketing plan of Koscot to be a pyramid promotional scheme as defined by that statute. The record supports that finding. A pyramid promotional scheme is defined in NRS 598.100(4) with sufficient clarity to meet constitutional standards. Koscot protests that the term "endless chain" is not defined in NRS 598.100 to 598.130, inclusive. The trial court did not find Koscot's marketing plan to be an "endless chain," nor did it mention or discuss that term. The question of the meaning of an "endless chain" is not before us and we will not consider it.

The judgment of the district court is affirmed.

THOMPSON, C. J., and MOWBRAY, GUNDERSON, and ZENOFF, JJ., concur.