K-MART CORPORATION, APPELLANT, *v.* STATE INDUSTRIAL INSURANCE SYSTEM AND ALL COMMISSIONERS THERETO, RESPONDENTS.

No. 14888

January 3, 1985                                          693 P.2d 562

*Richard S. Staub,* Carson City, for Appellant.

*Brian McKay,* Attorney General, and *Robert Gibb,* General Counsel for State Industrial Insurance System, Carson City, for Respondents.

*Vargas & Bartlett,* Reno, for Harrah's Inc., as Amicus Curiae.

14

## OPINION

By the Court, MANOUKIAN, C. J.:

This is an appeal from an order of the lower court on judicial review affirming the decision of the Nevada Industrial Commissioners. We hold that no impairment of contract occurred by the passage of A.B. 433 because this state's workers compensation act creates a status based relationship which is not contractual or consensual. Additionally, we hold that any retroactive effect of A.B. 433 was a valid exercise of the Legislature's police power. The State Industrial Insurance System's individual assessments against self-insured employers, derived by applying the statutory formula in section 10 of A.B. 433, did not constitute a regulation. Nevertheless, the System's unpromulgated rules on the date of payment and on permitting offsets against experience dividends were regulations. Accordingly, we affirm in part and reverse in part.

The 1981 Nevada Legislature passed A.B. 433 which, among other things, increased death and permanent total disability bene-

fits to claimants who were receiving compensation pursuant to Chapter 616. 1981 Nev. Stats. Ch. 573 §§ 2, 4. The cost of this program was approximately $11.5 million. The benefit increases were funded by a special assessment or premium increase against participating employers. 1981 Nev. Stats. Ch. 573 § 10. Pursuant to A.B. 433, the employer accounts department of the State Industrial Insurance System assessed K-Mart $47,369.37. Harrah's, amicus curiae in this case, was assessed $103,439.33.

After receipt of its assessment, K-Mart intervened in a hearing pending before the Nevada Industrial Commissioners in which several other employers had challenged their assessments. Following the administrative hearing, the Commissioners issued a unanimous decision on March 8, 1982. The Commissioners held that the System's implementation of the assessment formula provided in section 10 of A.B. 433 and the System's collection procedure did not constitute a regulation as defined in the Administrative Procedure Act (A.P.A.). *See* NRS 233B.010 *et seq.* The Commissioners also decided that K-Mart had been assessed the proper amount by the employer accounts department.

K-Mart petitioned for judicial review of the Commissioners' decision pursuant to NRS 233B.130. The district court affirmed the Commissioners' rulings regarding the propriety of the assess-. ment against K-Mart and the applicability of the A.P.A. to the System's actions. Additionally, the lower court held that the enactment of A.B. 433 and its implementation by the employer accounts department did not violate procedural due process. Moreover, the lower court ruled that A.B. 433 did not constitute an impairment of contract in violation of Article 1 Section 10 of the United States Constitution. K-Mart has appealed this decision.

*Agency Action as Regulations under A.P.A.*

The funding provision of A.B. 433 provided:

The increases provided in sections 2 and 4, inclusive, of this act must be funded by:

1. An increase in premium rates for employers who are insured by the Nevada Industrial Commission for the fiscal year beginning July 1, 1981, and ending June 30, 1982, which is equal to the cost imposed by sections 2 to 4, inclusive, of this act for that period, less the proportionate share of that cost assessed against self-insured employers; and

2. An assessment against self-insured employers who were insured by the Commission during the fiscal year beginning July 1, 1979, and ending June 30, 1980, of a percentage of the cost imposed by sections 2 to 4, inclusive, of this act which is equal to the percentage of the

total premiums paid to the Commission in the fiscal year beginning July 1, 1979, and ending June 30, 1980, that were paid by self-insured employers.

1981 Nev. Stats. Ch. 573 § 10 at 1227. Pursuant to the formula established by the Legislature in section 10, the System imposed a 7.7% increase on premiums paid by employers who had remained insured by the System. For those employers who had elected to self-insure after June 30, 1980, the System applied the formula in subsection two and arrived at individual assessments.

Under subsection two, the total premiums paid to the System in the fiscal year beginning July 1, 1979, and ending June 30, 1980, were found to be $123,532,000.00. Of that sum, 15% was paid by presently self-insured employers. The system then applied the simple formula provided in the statute, i.e., .15 x 11,500,000 = cost to self-insured employers to arrive at the proportionate share of the cost of the program which self-insured employers had to bear. To determine each self-insured employer's individual assessment, the System had only to determine the percentage of each employer's contribution to the total premiums paid by self-insured employers between July 1, 1979, and June 30, 1980, and multiply that percentage by the proportionate cost of the program to be borne by self-insured employers. This procedure and the supporting calculations were derived by the System upon advice of its consulting actuary, Alan Kaufman of Peat, Marwick, Mitchell and Company, on June 30, 1981, at an open meeting.

K-Mart contends that the System's action regarding the formula set forth in section 10 was a regulation pursuant to NRS 233B.038. Because the System did not follow the procedures for the adoption of regulations contained in NRS 233B.040 *et seq.*, K-Mart argues that the assessments are invalid. Both the Commissioners and the district court rejected K-Mart's argument. The district court stated that the implementation of section 10 was not a regulation under NRS 233B.038 because the formula was "a mere restatement of the mathematical calculation mandated in section 10. . . ."

NRS 233B.038 states that a "[r]egulation means an agency rule, standard, directive or statement of general applicability which effectuates or interprets law or policy, or describes the organization, procedure or practice requirements of any agency. The term includes a proposed regulation and the amendment or repeal of a prior regulation, . . ." *See also* Public Service Com'n v. Southwest Gas Corp., 99 Nev. 268, 634 P.2d 461 (1983); State Bd. of Equalization v. Sierra Pac. Power, 97 Nev. 461, 634 P.2d 461 (1981). In the present case, the result of the implementation of section 10 was neither a statement of general applicability nor

an agency action which was a policy-based interpretation of an existing statute which could have been otherwise construed. The System's action in determining the individual assessments by applying the formula set forth in section 10 was simply the agency's pronouncement of how the statute operated in a specific context. There is no reason to require the formalities of rulemaking whenever an agency undertakes to enforce or implement the necessary requirements of an existing statute. *Cf.* Burke v. Public Welfare Division, 570 P.2d 87 (Or.App. 1977) (agency action which explains what is necessarily required by existing regulations need not be promulgated). *Compare* State Bd. of Equalization, 97 Nev. 461, 634 P.2d 461 (1981) (Board of Equalization adoption of assessment formula pursuant to statute which merely called upon Board to adopt such formula was a regulation).

Additionally, K-Mart contends that two other requirements imposed by the System constituted regulations under NRS 233B.038. The System required that the self-insurer's assessments be paid in a lump sum by October 15, 1981, with a one month grace period, and stated that any experience dividend which the System owed to a self-insured employer under Regulation 37[1] would be offset against that employer's Section 10 assessment. K-Mart notes that section 10 does not mention when the assessments were payable or whether the assessments could be offset. In particular, K-Mart argues that the offsets against the experience dividends constituted an amendment of Regulation 37.320 which permits the System to credit an experience dividend to an employer's advance deposit if a deficiency existed in that account. *See* NAC 616.544(4).

An agency makes a rule when it does nothing more than state its official position on how it interprets a requirement already provided in the statute and how it proposes to administer the statute. State Bd. of Equalization, 97 Nev. at 464, 634 P.2d at 463. Here, the System's rulings on the payment and offset were not necessarily required by the statute. The adoption of a similar rule[2] pursuant to the A.P.A. belies the System's contention that

---

[1] Regulation 37 provided that employers whose insurance premiums less administrative expenses exceed limited losses attributable to compensation claims may receive a dividend. *See* NAC 616.534 *et seq.* The dividends were payable on or around October 15th of each year. *See* NAC 616.544(6).

[2] *See, e.g.,* NAC 616.544(4):

> If there is a deficiency balance in a policyholder's advance deposit on September 30 of the year following the year of the dividend, the dividend will be deposited for credit to the advance deposit to the extent necessary to cover the deficit.

rulemaking was not necessary in this instance. The System's decision to require a lump sum payment on October 15 and to permit offsets against the employer's experience dividends is a statement of general applicability which effectuates law or policy. *See* NRS 233B.038. These decisions were not made in compliance with the procedures for adoption of regulations pursuant to NRS 233B.040 *et seq.* Consequently, those two provisions are invalid. State Bd. of Equalization, 97 Nev. at 465, 634 P.2d at 463.

*Impairment of Contract*

K-Mart next contends that the lower court's ruling rejecting its impairment of contract claim was erroneous because a contract existed between the System and K-Mart which was affected by the retroactive operation of A.B. 433. The System responds that this court should follow a more recent line of cases which, for the purpose of the contract clause, have held that workers' compensation rights and obligations are not founded in contract. Our analysis, of course, starts with "the presumption of constitutional validity which every legislative enactment enjoys." Allen v. Pub. Emp. Ret. Bd., 100 Nev. 130, 133, 676 P.2d 792, 794 (1984).

Article 1 Section 10 of the United States Constitution provides that "[n]o State shall pass any . . . law impairing the obligation of contracts. . . ." As our recent contract clause cases demonstrate, the first issue to address is whether the relation purportedly affected by the legislation is "contractual." *See, e.g.,* Allen, 100 Nev. at 137, 676 P.2d at 796; Public Emp. Ret. v. Washoe Co., 96 Nev. 718, 615 P.2d 972 (1980); City of Las Vegas v. Central Tel. Co., 85 Nev. 620, 460 P.2d 835 (1969). Many courts deciding this issue have resolved that the relationship between employer and employee for the purposes of workers' compensation statutes is contractual in nature. *See* Horton v. Fleming Co., 590 P.2d 594 (Kan.App. 1979). Some of those courts have theorized that employers and employees implicitly contract to abide by the statutory compensation scheme. *See, e.g.,* Harris v. National Truck Service, 321 So.2d 690 (Ala.Civ.App. 1975); Cooper v. Wicomico Cty., Dept. of Public Works, 366 A.2d 55 (Md. 1976). Others emphasize the elective nature of their state's workers' compensation laws. *See, e.g.,* Tennessee Coal & Iron Div., U.S. Steel Corp. v. Hubert, 110 So.2d 260 (Ala. 1959).

In Nevada Industrial Comm'n v. Reese, 93 Nev. 115, 560 P.2d 1352 (1977), the concurring opinion proffered a similar argument. There, the court was responding to a challenge to the constitutionality of the incorporation of the Nevada A.P.A. into

the State Industrial Insurance Act and the establishment of an appeals officer to conduct administrative hearings in contested claims. The concurrence argued that no constitutional question was presented. Proceedings under the Industrial Act were "essentially contractual in character, sanctioned and encouraged by statute, but not compulsorily imposed on the parties." *Id.* at 128, 560 P.2d at 1360 (BATJER, C. J., concurring). The concurring opinion stated that NRS 616.305[3] suggests that employees and employers are "free to decline to adopt the terms of the N.I.I.A. to govern their relationship, and instead be governed by such rights and remedies as might be accorded them under the common law. . . ." *Id.* K-Mart contends that the full court should adopt this rationale regarding the impairment of contract issue.

Nevertheless, the analysis employed in those cases which hold workers' compensation to be contractual in nature has been subjected to sharp criticism. The dissent in *Reese* stated that under the N.I.I.A. "the right to elect is illusory and negative and cannot realistically be equated to situations in which parties mutually assent to special proceedings to determine their relative rights." *Id.* at 130, 560 P.2d at 1361 (GUNDERSON, J., dissenting). This position is supported by a persuasive opinion in Lester v. State Workmen's Compensation Com'r, 242 S.E.2d 443 (W.Va. 1978). After reviewing the history and nature of American workers' compensation laws, the *Lester* court concluded that it was a "gross fiction" to view workers' compensation as consensual or contractual. Opinions adhering to such a view, the West Virginia court noted, stem from attempts to avoid the early constitutional objections to the first industrial acts raised by the devotees of "economic individualism and *laissez-faire* capitalism." Those opinions argued that the acts' application depended upon the mutual assent of employers and employees. *Id.* at 448.

In summary, the *Lester* court held:

> [T]he rights and duties under our workmen's compensation statute are no longer contractual but grow out of the employer-employee status to which the law attaches certain duties and responsibilities. The liability of employers arises from the law itself, rather than from any agreement of the parties. The only significance adhering to the contractual

---

[3]NRS 616.305 provides in relevant part:

1. Where the employer, as provided by this chapter, has given notice of an election to accept the terms of this chapter, and the employee has not given notice of an election to reject the terms of this chapter, the employer shall provide and secure, and the employee shall accept, compensation in the manner provided by this chapter for all personal injuries sustained arising out of and in the course of employment.

> relationship is the existence of an employer-employee relationship. Once the employer-employee relationship is established, the *statute* imposes certain duties and responsibilities on the parties to that relationship.

*Id.* at 451 (emphasis added).

K-Mart argues that many of the courts which have rejected the contractual characterization come from states where the industrial act is compulsory. Although sound reasons exist for rejecting the contractual characterization of industrial insurance acts independent of the acts' elective or compulsory nature, K-Mart's observation is, to an extent, true. *See, e.g.,* Price v. All American Engineering Co., 320 A.2d 336, 339 (Dela. 1974); McAllister v. Bd. of Ed., Kearney, 191 A.2d 212 (N.J.App.Div. 1963), *aff'd* 198 A.2d 765 (N.J. 1964). Nevertheless, as the System argues, the concurrence in *Reese* improperly categorized the Nevada workers' compensation act as elective.

The *Reese* concurrence relied on NRS 616.305 as evidence of the Nevada act's elective nature. The concurring opinion in *Reese,* however, did not mention NRS 616.285. That statute provides that "[w]here an employer has in his service any employee under a contract of hire, except as otherwise expressly provided in this chapter, the terms, conditions and provisions of this chapter . . . shall be conclusive, compulsory and obligatory upon both employer and employee." Under NRS 616.090, "employer" is given a very broad definition. The only exemptions from NRS 616.285 seem to be employers and workers temporarily within the state, *see* NRS 616.260 (1981); employers of those employees excluded under NRS 616.060, *see* NRS 616.315 (1981); and sole proprietors. *See* NRS 616.317 (1981). Apparently, the election provision of NRS 616.305 applies only to those excluded employers. *See* NRS 616.315 (1981).

Nevada's workers' compensation act is properly characterized as compulsory. 4 Larson, *Workmen's Compensation Law,* App. A-7-2 (1984). To say that workers' compensation in this state is consensual and contractual is "gross fiction." *See, e.g.,* NRS 616.265 (1981) (contracts waiving liability under Act are null and void). The rights and duties under our workers' compensation statute are not contractual but based in the employer-employee status from which certain rights and responsibilities flow. Consequently, the lower court correctly ruled that A.B. 433 was not an unconstitutional impairment of contracts.

### Due Process

Our ruling that the contract clause is inapplicable does not complete our analysis. Besides the explicit constitutional provi-

sions against retroactive laws, such as the contract clause, the Supreme Court has also employed the due process clauses of the Fifth and Fourteenth Amendments to analyze retroactive legislation. Often the analysis is different from the contract clause in name only. Clarity of thought, however, requires a separate discussion.

Retroactive operation of newly-enacted legislation has been defined as a statute which takes away or impairs vested rights acquired under existing laws or creates a new obligation, imposes a new duty, or attaches a new liability in respect to transactions or considerations already past. C. Sands, *Sutherland Statutory Construction* § 41.01 (4th ed. 1973). In Virden v. Smith, 46 Nev. 208, 210 P. 129 (1922), this court reversed a lower court's compensation award of a $3,000 per month nurse allowance. The amendment to the industrial act which provided for the nursing allowance was enacted after the worker was injured and did not address the issue of retroactivity. There, the worker argued that the award of the allowance from the effective date of the amendment did not give the statute retroactive operation. Nevertheless, this court held that, since the worker's right to compensation was determined in accordance with the statute in force when he was injured, the effect of the lower court's award was to enlarge the benefits he had at the time of his accident. *Id.* at 212, 210 P. at 130.

K-Mart contends that A.B. 433 is, in essence, a retroactive increase in premiums. The language of section 10 which defines those employers who must pay the special assessment as presently self-insured employers who were insured by the Commission during the fiscal year beginning July 1, 1979, and ending June 30, 1980, K-Mart argues, plainly evidences the Legislature's intent to retroactively apply A.B. 433. The System responds that sections 2-4 of the bill state that the increased benefits provided by A.B. 433 must not be paid for any period before its date of enactment, July 1, 1981. *See* 1981 Nev. Stats. Ch. 573 §§ 2(2), 3(2), 4(2). Moreover, the System claims that a statute does not operate retroactively simply because it relies on past transactions to define the members of the class which it affects. Finally, the System concludes that statutes are not to be given retroactive effect unless the Legislature has clearly demonstrated such an intent.

On the whole, Amicus's analysis is the most persuasive. It argues that it is not the date on which the increased benefits are paid but the date when the original benefits accrued which determines whether a statute operates retroactively. NRS 616.625

(1980) provided that the amount of compensation and benefits to which an injured worker is entitled is determined as of the date of the accident or injury. Since the employees' or their survivors' right to death and permanent disability payments vested at the date of the disability or fatal accident, Harrah's contends that any subsequent increase in those accrued benefits constitutes a retroactive operation. Although A.B. 433 amended NRS 616.625 (1980) to exclude its benefit increases from that statute, *see* 1981 Nev. Stats. Ch. 573 § 7,[4] Harrah's claims that the amendment does not change the result. It argues that such an amendment itself constitutes a retroactive operation because, if given effect, it would change rights and liabilities already vested under that statute. This analysis comports with *Virden, supra,* and, consequently, we hold that A.B. 433 operates retroactively.

Many retroactive statutes, however, have been sustained under due process analysis because the particular legislative action was a permissible exercise of police power. In Usery v. Turner Elkhorn Mining Co., 428 U.S. 1 (1976), the Supreme Court validated legislation that required mine operators to pay benefits to miners who had contracted "black lung" disease. The operators contended that the statute violated due process because they were required to pay benefits to miners who had left their employment before the effective date of the act. The "black lung" legislation was sustained, even though "it upsets otherwise settled expectations" because it was a *rational* method to spread the costs of the mine workers' disabilities to those who have benefitted from their labor. *Id.* at 17-19.

K-Mart, however, relies on State ex rel. Briggs & Stratton v. Noll, 302 N.W.2d 487 (Wis. 1981), and argues that the increase in death and permanent disability benefits in this case did not constitute a valid exercise of police power. In *Briggs & Stratton,* the Wisconsin Legislature retroactively increased the maximum workers' compensation benefits. The *Briggs & Stratton* court held that the statute violated Art. 1 Sec. 1 of the Wisconsin Constitution, which is substantially equivalent to the due process clause of the Fourteenth Amendment. *Id.* at 491. Due process was violated, the Wisconsin court stated, because the "inflation justification" was not as urgent as the economic justification of the great depression presented in Home Building & Loan v. Blaisdell, 290 U.S. 398 (1934), or the national interest of World War II presented in Schmidt v. Wolf Contracting Co., 55 N.Y.S.

---

[4]NRS 616.625 (1981) provides that "[e]xcept as provided in sections 2, 3 and 4 of [A.B. 433] the amount of compensation and benefits and the person or persons entitled thereto must be determined as of the date of the accident or injury to the employee and their right thereto becomes fixed as of that date.

162 (N.Y.App.Div. 1945), *aff'd* 65 N.E.2d 568 (N.Y. 1946). The Wisconsin court's narrow interpretation of the police power, however, has been answered by this court in Koscot Interplanetary, Inc. v. Draney, 90 Nev. 450, 530 P.2d 108 (1974). There, we quoted approvingly from Veix v. Sixth Ward Bldg & L. Ass'n of Newark, 310 U.S. 32, 39 (1940): "Emergency does not create [police] power, emergency may furnish the occasion for the exercise of power." Koscot Interplanetary at 459, 530 P.2d at 114. Accordingly, this court rejected the argument raised by the pyramid sales promoters that, since an emergency equivalent to the great depression did not exist, the state could not rely on its police powers to overcome the retroactive operation of a statute which prohibited future and voided present pyramid promotional sales. *Id.*

In the instant case, the lower court found that the Legislature validly exercised its police power in enacting A.B. 433 to increase death and permanent disability benefits to offset the effects of inflation. We hold that the reduction of the spending power of those pensioners is a sufficient cause for the exercise of the police power and that it offsets any retroactive effect of A.B. 433.

Consequently, we hold that A.B. 433 does not violate the impairment of contracts clause of Article 1 Section 10 or the due process clause of the Fifth or the Fourteenth Amendments to the United States Constitution. Additionally, we hold that the System's action in determining the individual assessments for the self-insured employers did not constitute a regulation. We do, however, rule that the System's decision to require a lump sum payment of the assessment on October 15th and to permit an offset against the experience dividend was a regulation pursuant to NRS 233B.038. Because those regulations were not promulgated pursuant to the A.P.A., they are invalid.

Accordingly, the lower court's judgment is affirmed in part but reversed as to its ruling on the validity of the date and manner of payment and the offset against the experience dividend.

SPRINGER, MOWBRAY, STEFFEN, and GUNDERSON, JJ., concur.