RAYLENE G. MORGAN, LINDA AVILLA, TED P. BENDURE, R. J. BENNETT, LARRY G. BOYLES, CHECO CASTANEDA, SR., DON CHAMBERLAIN, MARK CHRYSTALL, J. CONNERS, TRACY CORDARO, RANDY M. COTTER, DAVID CRONGEYER, FRED CROSBY, T.R. DEAL, TOD DERICCO, KEVIN EBEN, WILLIAM EULARD, GLENN D. FOLKERS, SR., G. FORBUSH, A.R. GAEDICKE, JIM GAROUTTE, LORETTA A. GIBBS, JOE GNIBUS, GARY GRAEBER, MICHAEL I. HAZLETT, MICHAEL E. HOMES, BERYL H. INMAN, DWIGHT H. JUDD, JEFFREY C. KING, RAY KIRSCHMAN, RICHARD LANG, DELANO LEWIS, TIM LUCICH, DONALD A. MICALIZZI, JIM MILETICH, MIKE MONTES, JON H. MURRAY, PAUL D. PATTERSON, JOHN E. PRICE, ROY QUILIA, THOMAS C. REDICAN, RONALD REX ROGERS, DELTON G. SANDERS, TED R. SMITH, DEAN STATHOS, NORMAN G. SUAREZ, ROSS TURNBAUGH, CHARLES RAY TURNER, JAMES VANATTA, RICK E. WASHER, JACK C. WITHERELL, AARON YOHEY, Appellants, *v.* COMMITTEE ON BENEFITS; STATE OF NEVADA; JUDY MATTEUCCI; JEANNE ADAMS; FRED SUWE; LILLIAN BERGEVIN; STEVE NIELSON; AND BYERLY & COMPANY, Respondents.

No. 25072

May 2, 1995 894 P.2d 378

*McCracken, Stemerman, Bowen & Holsberry,* Las Vegas, and *Walter R. Tarantino,* Carson City, for Appellants.

*Frankie Sue Del Papa,* Attorney General, and *Thomas J. Ray,* Solicitor General, Carson City, for Committee on Benefits; State of Nevada, Judy Matteucci; Jeanne Adams, Fred Suwe; Lillian Bergevin and Steve Nielson.

*Morse & Mowbray,* Las Vegas, for Byerly & Company.

## OPINION

*Per Curiam:*

Respondent Committee on Benefits ("Committee") acts as an advisory and oversight body on matters relating to group insurance for nearly 20,000 persons, including state employees and their dependents and employees of other political subdivisions within the State that qualify pursuant to NRS 287.043(2). *See*

*also* NRS 287.010-040. The Committee is composed of the following five members: the Director of the Department of Administration; two members selected by the Board of Directors of the Nevada State Employees Association; and two members appointed by the Governor, one of whom must be a retired state employee. NRS 287.041.

NRS 287.043(4) commands the Committee to "[p]urchase policies of life, accident or health insurance . . . or provide similar coverage through a plan of self-insurance . . . ." In a nonimperative manner, NRS 287.0433 provides in part:

> The committee on benefits may establish a plan of life, accident or health insurance and provide for the payment of contributions into the self-insurance fund, a schedule of benefits and the disbursement of benefits from the fund.

Pursuant to this statute, the Committee elected to establish a self-insurance fund for state employees and employees of other qualifying political entities. The same statute requires the Committee to maintain the fund's solvency, stating: "Payments into and disbursements from the fund must be so arranged as to keep the fund solvent." *Id.*

State employees and other qualifying persons are not required to participate in the plan, but, if they choose to do so, must authorize salary deductions for the payment of premiums. *See* NRS 287.046; NRS 287.048.

In September 1992, the Committee discovered that its self-funded plan had greatly exceeded anticipated costs. Appellants, who are participants in the self-funded plan, note that the fund moved from a $4.9 million surplus (over and above a $12.1 million reserve fund for outstanding claims) in fiscal year 1991, to a $5.5 million deficit in fiscal year 1992, a figure which was later revised to a $2.9 million deficit. On October 1, 1992, the Committee met to consider several alternative measures to address the fiscal crisis and select the one that would be most efficacious in resolving the problem. The Committee acknowledges that it did not follow the Nevada Administrative Procedures Act ("APA") to provide public notice of the purpose and substance of changes to the plan or to allow the Legislature an opportunity for review. *See* NRS 233B.0603; NRS 233B.063.

The Committee notes, however, that two of its members are selected by the Board of Directors of the Nevada State Employees Association, that its meetings are always open to the public, that it provides public postings, and that it mails meeting and agenda notices to approximately 130 individuals and agencies that request special notice as required by NRS 287.043(2) and NRS 241.010-.040 (Nevada's Open Meeting Law). Accordingly, the Committee claims that all plan participants were given ample

opportunity to learn of and respond to the changes and that input from participants contributed to the plan's final version.

Appellants contend that the only notice of the scheduled meeting to discuss plan alternatives was a one-line item on the Committee's posted agenda indicating that there would be discussion concerning the insurance fund. Appellants insist that requiring the Committee to follow the APA notice and comment procedures was essential to their rightful opportunity to provide input and debate regarding premium and benefit design changes.

At the October 1, 1992 meeting, the Committee adopted a plan modification, effective January 1, 1993, that would significantly cut reimbursements for certain health-related visits to medical doctors and for visits to nonpreferred provider organizations. The Committee also slightly increased premiums for the following three categories: (1) employees; (2) employees plus spouse; and (3) employees plus nonspouse dependent(s). Additionally, the Committee substantially increased premiums (raising premiums from $130 to $306 per month—a 235% increase) for a fourth category, "employees plus spouse plus non-spouse dependent(s)." According to the Committee, this fourth category had previously been subsidized by nonfamily participants or, in effect, the State, which pays a fixed amount of money into the fund on a per employee basis. *See* NRS 287.044; 287.046(1); 287.049. On October 7 and 8, 1992, the Committee sent notices of the plan changes to all paycenters and to the publisher for distribution to participants as mandated by NRS 287.043(3).

The Committee's next meeting occurred on October 26, 1992. However, prior to and during this meeting, many of the participants in the plan voiced their objections to the restructured plan, specifically denouncing the drastic premium increase in the fourth category of participants. In response, the Committee voted to decrease by $100 per month the premiums paid by this fourth category, thus reducing the rate increase from 235% to 58%. In order to maintain the fund's solvency, as required by NRS 287.0433, the Committee extended the time allotted to replenish the $12.1 million reserve fund. Again, these changes were properly published to paycenters and ultimately to plan participants. *See* NRS 287.043(3).

On December 14, 1992, appellants filed a complaint in the district court alleging, among other things, that the Committee violated the APA. Appellants claimed that plan changes in premium rates and benefit schedules constituted regulations that are subject to the APA's adoption process. Appellants moved for a preliminary injunction to prevent the plan from taking effect on the appointed date of January 1, 1993. The district court denied the motion, and simultaneously granted a motion filed by the Committee to change venue to the First Judicial District Court.

Appellants thereafter filed a motion for injunctive relief and a writ of mandamus in the First Judicial District Court, claiming that the Committee violated the APA's adoption process. Respondents countered with a motion for summary judgment as to all of the appellants' claims. The district court ruled that the Committee's actions were not regulations within the context of the APA and denied appellants' motion for injunctive and mandamus relief. The district court stated:

> Each of the cases [cited by the appellants] involved the determination of a licensing or regulatory state agency. The determination of these agencies have a pervasive impact on state policy and the Nevada public. The Committee's determination of contribution rates and benefits only impacts state employees enrolled in the state health insurance plan. Setting premium and benefits within the statutory confines designated by the legislature does not rise to the level of policy or ad hoc rule making.

The district court also granted summary judgment in favor of the Committee on all claims against it for monetary damages, finding that the Committee had discretionary immunity. The district court then entered judgment on these issues pursuant to NRCP Rule 54(b). Appellants thereafter appealed. By order dated April 5, 1994, this court limited the appeal to the issue of whether the district court abused its discretion in denying appellants' request for injunctive relief and a writ of mandamus.

## DISCUSSION

This appeal primarily results from the lack of clear legislation governing the Committee on Benefits. Although legislation authorizes the Committee to contract with health-related entities to provide insurance, see NRS 287.0434, no legislative guidance is provided to the Committee regarding the determination of payment contributions and the scheduling of benefits or, specifically, whether the Committee's changes to rates or coverage constitute regulations within the purview of the APA. We initially suggest that such legislation would be of unquestionable benefit to the Committee and the participants in the plan.

The Nevada Administrative Procedure Act provides:

> By this chapter, the legislature intends to establish minimum procedural requirements for the regulation-making and adjudication procedure of all agencies[1] of the executive depart-

---

[1]NRS 233B.031 defines "Agency" as follows: "'Agency' means an agency, bureau, board, commission, department, division, officer or employee of the executive department of the state government authorized by law to make regulations or to determine contested cases."

ment of the state government and for judicial review of both functions, except those agencies expressly exempted pursuant to the provisions of this chapter. This chapter confers no additional regulation-making authority upon any agency except to the extent provided in subsection 1 of NRS 233B.050.

NRS 233B.020(1).

According to NRS 233B.039(2),[2] the Committee on Benefits is required to follow the APA when it engages in regulation-making. In addition, NRS 287.043(7) states that the Committee on Benefits shall:

Adopt such regulations and perform such other duties as are necessary to carry out the provisions of NRS 287.041 to 287.049, inclusive, including the establishment of:

(a) Fees for applications for participation in the state's program and for the late payment of premiums;

(b) Conditions for entry and reentry into the state's program by public agencies enumerated in NRS 287.010; and

(c) The levels of participation in the state's program required for employees of participating public agencies.

At issue in this case is whether the Committee's actions in adjusting rates and coverage constitute regulation-making. NRS 233B.038 defines "Regulation" as follows:

"Regulation" means an agency rule, standard, directive or statement of general applicability which effectuates or interprets law or policy, or describes the organization, procedure or practice requirements of any agency. The term includes a proposed regulation and the amendment or repeal of a prior regulation, but does not include:

1. A statement concerning only the internal management of an agency and not affecting private rights or procedures available to the public;

2. A declaratory ruling;

3. An intraagency memorandum;

4. An agency decision or finding in a contested case; or

5. A regulation concerning the use of public roads or

---

[2]NRS 233B.039(2) provides: "The department of education, the *committee on benefits* and the commission on professional standards in education *are subject to the provisions of this chapter [APA] for the purpose of adopting regulations* but not with respect to any contested case." (Emphasis added.)

In 1987, the legislature effectively amended NRS 233B.039(2) by providing: "The committee on benefits shall by regulation provide for specific procedures for the determination of contested claims." NRS 287.0432.

facilities which is indicated to the public by means of signs and signals.

The Nevada Administrative Code ("NAC") currently contains regulations enacted by the Committee to govern the selection of brokers, participation by public agencies in the self-funded program, the payment of premiums by and the coverage of certain types of state employees and retired persons, the claims process, and issues regarding deferred compensation. NAC 287.005-.735; *see also* NRS 287.043(7)(a)-(c).

We have found no case specifically addressing whether alterations to a voluntary, private-like, self-funded state insurance plan constitute regulation-making subject to the APA. Appellants cite several cases involving government or state employees who were impacted by policies or rules devised by administrative bodies, where the courts required the administrative bodies to follow the APA. Each of these cases are distinguishable, however, because the invoked rules directly affected the nature or termination of the impacted parties' employment. *See* Armistead v. State Personnel Bd., 583 P.2d 744, 746 (Cal. 1978) (provisions of state personnel transactions manual governing withdrawal of resignation by state employees concerned "termination of employment, a matter of import to all state civil service employees" and was deemed a rule subject to APA rulemaking procedure); Poschman v. Dumke, 107 Cal. Rptr. 596, 603 (Cal. Ct. App. 1973) (rule affecting tenure of teachers was considered subject to APA rulemaking procedures and was not a rule relating to internal management because the matter was "of serious consequence involving important public interest"). Although insurance benefits certainly impact career employment decisions, availability of the State self-funded plan does not affect employment *per se*. Furthermore, other cases cited by appellants impact either an entire industry or the public at large. *See* Las Vegas Transit System v. Las Vegas Strip Trolley, 105 Nev. 575, 780 P.2d 1145 (1989) (Public Service Commission's new definition of "trolley" set standards of general applicability and effectuated policy constituting rulemaking); Coury v. Whittlesea-Bell, 102 Nev. 302, 721 P.2d 375 (1986) (Public Service Commission's defining and certifying "stretch" limousines constitutes rulemaking subject to APA); Public Service Comm'n v. Southwest Gas Corp., 99 Nev. 268, 662 P.2d 624 (1983) (rate design change impacted all utility consumers, and thus the public, and constituted a regulation subject to APA).

The Committee contends that the APA was intended for executive agencies, and since the Committee was set up by the Legisla-

ture as an advisory body, it should not be subject to the APA. We disagree. The Legislature initially included the Committee within the APA's provisions where the Committee engaged in regulation-making. NRS 233B.039(2). Later, the Legislature directed the Committee to follow the APA in determining procedures for adjudication of individual cases. NRS 287.0432. Given these mandates, the Committee is as restricted as any other agency subject to the APA. Therefore, the Committee is not free to ignore the APA's notice and comment procedures.

The Committee also notes that NRS 287.043(7) provides a list of activities that constitute regulations, and suggests that because rate-setting and benefit coverage are not included, the Legislature must not have intended that these activities be viewed as regulations. We note, however, that NRS 287.043(7)(a)-(c) does not include procedures for selecting brokers of record, consultants, claims administrators and other vendors. Nonetheless, among the first regulations noted in the NAC that apply to the Committee deal with the process of selecting such persons. NAC 287.010-.080. Accordingly, we agree with appellants that the list of activities identified as regulations in NRS 287.043(7)(a)-(c) is not exhaustive.

In deciding whether changes in premium rates and benefit coverage constitute a regulation, we find instructive the case of Public Service Comm'n v. Southwest Gas Corp., 99 Nev. 268, 662 P.2d 624 (1983). Appellants cite this case for the proposition that rate-setting can be deemed a regulation. We are not persuaded. In *Southwest Gas,* the Public Service Commission ("PSC") attempted to effect a rate design change through a rate increase application, thus avoiding the APA's notice and comment procedures. *Id.* at 270-71, 662 P.2d at 625. As we stated, "[r]ate design changes are substantially different from changes in rate." *Id.* Because the PSC did not give adequate notice of a change in rate design and such action constituted a regulation, we concluded that the PSC's actions did not conform to the applicable notice and hearing requirement or the APA's notice and comment provisions. *Id.* at 272-73, 662 P.2d at 626-27.

In the instant case, we conclude that the Committee's actions setting rates and benefit coverage are analogous to utility rate increases. Utility companies are not required to follow APA notice and comment procedures every time they apply for a rate increase. Instead, they follow notice and hearing requirements mandated by NRS 704.100-.130. Similarly, the Committee is required to provide notice of changes in rates and coverage in conformity with NRS 287.043(3). Additionally, a majority of the Committee must be present for the transaction of any business,

and the Committee's meetings are subject to the Open Meeting Laws.

Although certain actions affecting rates and coverage may rise to the level of regulation-making, as they did in *Southwest Gas,* we conclude that the Committee's actions at issue here do not constitute regulation-making. "'An administrative construction that is within the language of the statute will not readily be disturbed by the courts.'" State Gaming Comm'n v. GNLV Corp., 108 Nev. 456, 458, 834 P.2d 411, 413 (1992) (quoting Dep't Human Res. v. UHS of The Colony, 103 Nev. 208, 211, 735 P.2d 319, 321 (1987)). NRS 287.043(4) charges the Committee to "provide [policies of life, accident or health insurance] through a plan of self-insurance for the benefit of all eligible public officers, employees and retired employees who participate in the state's program." With this mandate comes the inherent discretion to determine an appropriate level of coverage depending on the State's and the employees' ability and willingness to pay for the coverage.

As noted by the Committee, when faced with a fund-solvency crisis, the Committee can do one, or a combination, of two things: increase rates or decrease coverage. The case of Illinois Federation of Teachers v. Bd. of Trustees, 548 N.E.2d 64 (Ill. App. Ct. 1989), states, and we agree:

> Where there is an express grant of authority there is likewise a clear and express grant of power to do all that is reasonably necessary to execute the power or perform duties specifically conferred by the enabling statute. This authority need not always be exercised through a process of formal rule making. We decline to adopt the plaintiff's reasoning which suggests every action which an administrative agency takes, not made subsequent to a formal rule, may be challenged as outside the legal authority of that agency.

*Id.* at 67 (citation omitted).

Changes in rates and benefits are integral to the Committee's function. Given the upward trend in medical costs and the limited resources of participants, a continuing effort to balance costs and coverage is required to ensure the self-insurance fund's feasibility and solvency. As we stated in K-Mart Corp. v. SIIS, 101 Nev. 12, 693 P.2d 562 (1985), "[t]here is no reason to require the formalities of rulemaking whenever an agency undertakes to enforce or implement the necessary requirements of an existing statute." *Id.* at 17, 693 P.2d at 565. We therefore conclude that the district

court did not err in determining that "[s]etting premium and benefits within the statutory confines designated by the legislature does not rise to the level of policy or ad hoc rule making."

Furthermore, we note that several legislative safeguards are in place to assure that the Committee cannot disregard the interests of the participants. Notably, NRS 287.041 requires that two members of the Committee be selected by the Board of Directors of the Nevada State Employees Association, and that another member, selected by the Governor, must be a retired employee. Additionally, as noted previously, all Committee meetings are subject to the Open Meeting Laws. Finally, while appellants are legitimately concerned about the lack of notice they received from the Committee about the pending changes, the Committee appears to have been quite responsive to the participants' objections by altering premium rates in the fourth category to a tolerable level.

## CONCLUSION

Having concluded that the Committee's actions do not constitute regulation-making, we affirm the district court's order denying appellants' motion for injunctive relief and for a writ of mandamus.