819 F.2d 1237
 55 USLW 2665
 Antonio NIEVES and Ellen Schuster Nieves, Appellants,
v.
HESS OIL VIRGIN ISLANDS CORPORATION.
Samuel COTTO, Appellant,
v.
HESS OIL VIRGIN ISLANDS CORPORATION.
Joseph R. TAYLOR, Appellant,
v.
HESS OIL VIRGIN ISLANDS CORPORATION.
George THOMAS, Appellant,
v.
HESS OIL VIRGIN ISLANDS CORPORATION.
Phillip SCOTLAND and Pearline Scotland
v.
HESS OIL VIRGIN ISLANDS CORPORATION, Appellant.
Pauliphy PREVOST
v.
HESS OIL VIRGIN ISLANDS CORPORATION, Appellant.
 Nos. 86-3049, 86-3065 to 86-3067, 86-3584 and 86-3585.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 1, 1986.
Decided May 22, 1987.
Rehearing and Rehearing In Banc in Nos. 86-3049, 86-3065 to
86-3067, and 86- 3585 Denied June 18 and June 22, 1987.
 
 John K. Dema, John K. Dema, P.C., Christiansted, St. Croix, U.S. Virgin Islands, for Antonio Nieves and Ellen Schuster Nieves, appellants in No. 86-3049.
 Thomas Alkon, Gordon C. Rhea (argued), Christiansted, St. Croix, U.S. Virgin Islands, for Samuel Cotto, appellant in No. 86-3065, Joseph R. Taylor, appellant in No. 86-3066 and George Thomas, appellant in No. 86-3067.
 Mary Faith Carpenter, Law Offices of Desmond L. Maynard, St. Thomas, U.S. Virgin Islands, for Phillip Scotland and Pearline Scotland, appellees in No. 86-3584.
 John R. Coon, Christiansted, St. Croix, U.S. Virgin Islands, for Pauliphy Prevost, appellee in No. 86-3585.
 Britain H. Bryant, Nancy V. Young, St. Croix, U.S. Virgin Islands, M. David Gelfand (argued), New Orleans, La., for Hess Oil Virgin Islands Corp., appellee in No. 86-3049, No. 86-3065, No. 86-3066, and No. 86-3067, appellant in No. 86-3584 and No. 86-3585.
 Before SLOVITER, STAPLETON and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 
 1
 The issue on appeal is whether the Virgin Islands legislature's amendment of the Virgin Islands Workmen's Compensation Act (the Act) to retroactively eliminate application of the "borrowed employee" doctrine as a bar to pending tort suits constitutes an unjustified impairment of the contractual obligations of Hess Oil Virgin Islands Corporation (Hess or HOVIC), or a violation of Hess' due process rights. Six employees of Litwin Panamerican, Inc. (Litwin) who were injured while on loan to and working for Hess filed separate tort actions against Hess. In each case, Hess moved for summary judgment on the basis of the "borrowed employee" doctrine under which workmen's compensation was the employee's exclusive remedy. In four of the cases, Hess' motions were granted. The legislature then amended the Act, and Hess' motions in the two remaining cases were denied. Appeals are before us in all six cases. Our jurisdiction rests on 28 U.S.C. Secs. 1291, 1292(b).
 
 I.
 Facts
 A. The "Borrowed Employee" Doctrine
 
 2
 In 1976, Hess and Litwin entered into an agreement, amended in 1980, whereby Litwin was to provide personnel to perform general maintenance and turnaround work at Hess' St. Croix refinery. Under the agreement, Litwin workers were divided into two classes. Employees in the class involved here, Type-I personnel, were furnished "as loanees under HOVIC's direction and control in the numbers and by skills as ordered from time to time by HOVIC." Nieves App. at 25.[1] Hess assumed "direct supervision, direction and control" over these employees, and Litwin was not "responsible to HOVIC or liable for the workmanship of such personnel or for any mistake, error or act of negligence of such personnel." Nieves App. at 24. Litwin was responsible for maintaining "at its own expense" Virgin Islands workmen's compensation insurance, any other statutorily required workmen's compensation insurance and employer's liability insurance against common law claims. Nieves App. at 32. With respect to Type I work, Hess agreed to "defend, indemnify and hold [Litwin] harmless from any and all loss, damage, injury, liability, claim, demand, cause of action and judgment for personal injuries or death or for damage to or loss of property ... from any occurrence resulting from the performance of said work under this Agreement...." Nieves App. at 33-34. When hiring employees to serve as Type-I employees on loan to Hess, it was Litwin's practice to have them sign a Hess loanee form. That form states:
 
 
 3
 This is to inform you of the conditions under which you will be working as a "HESS LOANEE". You should be aware that while working as a loanee:
 
 
 4
 1. HOVIC personnel will control, direct, and supervise all aspects of your work.
 
 
 5
 2. At no time should you receive, or act under instructions from Litwin Supervision.
 
 
 6
 3. HOVIC will provide you with safety equipment and will ensure that all safety conditions surrounding your work are met.
 
 
 7
 Nieves App. at 61.
 
 
 8
 George Vanterpool, originally hired by Litwin as a Type-I employee in 1976, brought suit against Hess seeking damages for injuries sustained as a result of Hess' alleged negligence while Vanterpool was on loan to Hess in 1981. At that time, the exclusive remedy provision of the Virgin Islands Workmen's Compensation Act stated:
 
 
 9
 When an employer is insured under this chapter, the right herein established to obtain compensation shall be the only remedy against the employer.
 
 
 10
 24 V.I.C. Sec. 284 (1970). In 1984, the district court held that under the borrowed employee doctrine this section could apply to bar Vanterpool's tort action against Hess, his borrowing employer. See Vanterpool v. Hess Oil Virgin Islands Corp., 589 F.Supp. 334, 339 (D.V.I.1984), aff'd in part and rev'd in part, 766 F.2d 117 (3d Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 801, 88 L.Ed.2d 777 (1986). Under the common law borrowed employee doctrine:
 
 
 11
 ... if a special (borrowing) employer exercises a sufficient degree of control over a borrowed employee for a time sufficient to suggest that the employee has assessed the risks of his new employment and has acquiesced in his borrowing employer's control, the borrowing employer may be deemed a statutory employer for purposes of workers' compensation.... The borrowed employee is then barred from suing his borrowing employer for injuries sustained during the course of his employment; instead, the borrowed employee is remitted to the exclusive remedy provided by the relevant workers' compensation act.
 
 
 12
 Vanterpool v. Hess Oil Virgin Islands Corp., 766 F.2d 117, 121 (3d Cir.1985).
 
 
 13
 The district court's holding was the first application of the borrowed employee doctrine in the Virgin Islands. In response, on October 19, 1984, the Virgin Islands legislature added to the Workmen's Compensation Act a section abrogating the borrowed employee doctrine. That section states:
 
 
 14
 It shall not be a defense to any action brought by or on behalf of an employee, that the employee at the time of his injury or death was the borrowed, loaned, or rented employee of another employer. Any oral or written agreement between an employer and employee which makes the employee the borrowed, loaned or rented employee of another employer shall be null and void as being against the public policy of this Territory.
 
 
 15
 24 V.I.C. Sec. 263a (1986).
 
 
 16
 Although section 263a had been enacted when Vanterpool's appeal came before this court, we referred to it in a footnote only, stating that the "amendment's effect is prospective only." Vanterpool, 766 F.2d at 119 n. 1. We agreed with the district court that the borrowed employee doctrine was applicable in the Virgin Islands. Id. at 121-26.
 
 
 17
 On January 23, 1986, the Virgin Islands legislature amended the exclusive remedy provision of the Workmen's Compensation Act, adding a statement that:
 
 
 18
 The "statutory employer and borrowed servant" doctrine are not recognized in this jurisdiction, and an injured employee may sue any person responsible for his injuries other than the employer named in a certificate of Insurance issued under Section 272 of this Title.
 
 
 19
 Bill No. 498, 16th Legislature Sec. 1(a) (1986) (to be codified at 24 V.I.C. Sec. 284(b)), Nieves App. at 150. This provision, to be codified as 24 V.I.C. Sec. 284(b), does not appear to be substantively different from the 1984 amendment codified as 24 V.I.C. 263a in its effect on the borrowed employee doctrine. However, the proposed addition was made applicable not only to claims filed after the effective date of the amendment but also to "claims pending as of the effective date of this Act: regardless of when the accident which gave rise to the claim occurred." Bill No. 498, 16th Legislature Sec. 1(b) (1986), Nieves App. at 151. On February 5, 1986, the Governor of the Virgin Islands vetoed the Bill, referring to the effect of its retrospective application in the six pending cases presently before us on appeal. See Prevost v. Hess Oil Virgin Islands Corp., 640 F.Supp. 1220, 1221-22 n. 2 (D.V.I.1986). On February 27, 1986, the veto was overridden and the bill, including the retroactive application provision, became law. Id.
 
 B. The Current Proceedings
 
 20
 Each of the six cases before us was brought by a borrowed employee of Hess who sued Hess for injuries allegedly caused by Hess' negligence. Each case was pending at the time the retroactive application provision became law.
 
 
 21
 Antonio Nieves was hired by Litwin on June 27, 1983, and was assigned to work at Hess as a heavy equipment mechanic. On September 28, 1983, while on loan to Hess, he fell from a cherry picker and suffered a double hernia and nerve damage in his pelvic area. He filed his complaint against Hess on December 3, 1984. On November 1, 1985, the district court granted Hess summary judgment on the ground that Nieves was "the borrowed employee of HOVIC. HOVIC is therefore immune from Nieves' suit." Nieves v. Hess Oil Virgin Islands Corp., No. 84-336, slip op. at 5 (D.V.I. Nov. 1, 1985), Nieves App. at 178.
 
 
 22
 Joseph Taylor began intermittent employment with Litwin in 1976. On April 2, 1984, after five months of continuous employment on loan to Hess, he suffered a back injury as the result of a scaffold collapse. He filed his complaint on July 11, 1984. On September 18, 1985, the district court granted Hess summary judgment on the basis of the borrowed employee doctrine. Taylor v. Hess Oil Virgin Islands Corp., No. 84-205 (D.V.I. Sep. 18, 1985), Taylor App. at 137-44.
 
 
 23
 George Thomas was a Litwin employee on loan to Hess. On March 20, 1982, while working at Hess, he suffered a back injury from a manhole cover collapse. On February 23, 1983, he filed his complaint against Hess. On September 18, 1985, the district court granted Hess summary judgment on the basis of the borrowed employee doctrine. Thomas v. Hess Oil Virgin Islands Corp., No. 83-93 (D.V.I. Sep. 18, 1985), Thomas App. at 6-16.
 
 
 24
 Samuel Cotto had worked intermittently for Litwin for several years and was hired again on May 30, 1984 to serve as a scaffolder on loan to Hess. On May 31, 1984, while on loan to Hess, he suffered back injuries from a falling pipe. On November 8, 1984, he filed his complaint against Hess. On November 1, 1985, the district court granted Hess summary judgment on the basis of the borrowed employee doctrine. Cotto v. Hess Oil Virgin Islands Corp., No. 84-318 (D.V.I. Nov. 1, 1985), Cotto App. at 129-37.
 
 
 25
 Each of the four plaintiffs moved for reconsideration under Fed.R.Civ.P. 59 in light of the legislature's addition to the Workmen's Compensation Act of section 263a. On December 12, 1985, the district court denied the motions for reconsideration in all four cases. Citing the conclusion of this court in Vanterpool, 766 F.2d at 119 n. 1, that section 263a was to have prospective effect only, the court stated:
 
 
 26
 Clearly, the Third Circuit considered, as we do, that to apply the statute retroactively in litigation involving only private parties, would be a manifest injustice to one of the parties who, acting under existing law, made significant and legitimate business decisions. What the plaintiffs actually seek is to have those legitimate business decisions, legal when made, declared illegal ex post facto. That is what the effect of a retroactive application of the amendment adopted by the Virgin Islands Legislature would be.
 
 
 27
 Nieves v. Hess Oil Virgin Islands Corp., No. 84-336, slip op. at 3 (D.V.I. Dec. 12, 1985), Nieves App. at 182. Nieves, Taylor, Thomas and Cotto all appeal from the district court's grant of summary judgment to Hess and its subsequent denial of reconsideration. We have jurisdiction over their appeals under 28 U.S.C. Sec. 1291. Our review of the grant of summary judgment is plenary.
 
 
 28
 Pauliphy Prevost and Phillip Scotland were also Litwin employees on loan to Hess when they suffered injuries. Prevost had been hired by Litwin for work as a Hess loanee 27 times since 1977. On December 5, 1983, while working at the Hess refinery, he suffered injuries as a result of inhaling hydrogen sulfide fumes. Prevost's complaint seeking damages from Hess was filed in 1984. On August 19, 1985, Hess moved for summary judgment on the basis of the borrowed employee doctrine. Prevost App. at 12-25.
 
 
 29
 Scotland was hired by Litwin as a Hess loanee in 1982. On May 23, 1983, while constructing a dock at the Hess refinery, he injured a finger. Scotland's complaint seeking damages from Hess was filed in 1985. On January 14, 1986, Hess moved for summary judgment on the basis of the borrowed employee doctrine. Scotland App. at 13-26.
 
 
 30
 The district court did not rule on Hess' motions for summary judgment in Prevost and Scotland until August 7, 1986, after the 1986 amendment of section 284 and enactment of the provision giving the newly enacted section 284(b) retroactive application. Rejecting Hess' argument that retroactive application of the amendment constituted either an unjustified impairment of contractual obligations or a violation of due process, the court applied the amendment to the actions before it, and concluded that "the borrowed employee doctrine is no longer a valid defense." Prevost v. Hess Oil Virgin Islands Corp., 640 F.Supp. at 1225. The court, therefore, denied Hess' motions for summary judgment.
 
 
 31
 Following certification by the district court pursuant to 28 U.S.C. Sec. 1292(b) that its orders in Prevost and Scotland involved a controlling question of law as to which there is substantial ground for difference of opinion, Hess filed a petition to appeal in both cases, which this court granted. Because the matter is one of law, our standard of review is plenary.
 
 
 32
 Hess does not contest the legislature's authority to abolish the borrowed employee doctrine in the Virgin Islands. Hence the prospective application of the statutes so providing is unchallenged. Hess limits its challenge to the legislature's right to enact a provision retroactively applying the abolition of the borrowed employee doctrine to cases already in litigation. We will refer throughout to that provision, which has not been codified, as the retroactive application provision.II. Impairment of Contract
 
 A. The Standard
 
 33
 Hess contends that the retroactive application provision violates the Contract Clause of the United States Constitution, Art. I, Sec. 10, cl. 1 ("[n]o state shall ... pass any ... law impairing the Obligation of Contracts") as extended to the Virgin Islands by the Bill of Rights of the Virgin Islands Revised Organic Act of 1954, 48 U.S.C. Sec. 1561 ("No law impairing the obligation of contracts shall be enacted").
 
 
 34
 The Supreme Court has established a three-step analysis for determining whether retroactive legislation constitutes an impairment of contract. The threshold inquiry is whether the law has operated "as a substantial impairment of a contractual relationship." Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 411, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983) (quoting Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 244, 98 S.Ct. 2716, 2722, 57 L.Ed.2d 727 (1978)). As part of this threshold inquiry, those parties challenging the law bear the burden of demonstrating that they in fact possess contractual rights or obligations altered by the law. Cf. National Railroad Passenger Corp. v. Atchison, Topeka & Santa Fe Railway Co., 470 U.S. 451, 472, 105 S.Ct. 1441, 1455, 84 L.Ed.2d 432 (1985).
 
 
 35
 If the law is found to constitute a substantial impairment, the second step is to determine whether the government entity, in justification, had a "significant and legitimate public purpose behind the regulation ... such as the remedying of a broad and general social or economic problem." Energy Reserves, 459 U.S. at 411-12, 103 S.Ct. at 704. Finally, once such a legitimate public purpose is identified, the court must determine "whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.' " Energy Reserves, 459 U.S. at 412, 103 S.Ct. at 705 (quoting United States Trust Co. v. New Jersey, 431 U.S. 1, 22, 97 S.Ct. 1505, 1518, 52 L.Ed.2d 92 (1977)). That determination will necessarily depend upon whether the state is a party to the contract at issue. If it is not, " 'as is customary in reviewing economic and social regulation, ... courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.' " Energy Reserves, 459 U.S. at 412-13, 103 S.Ct. at 705 (quoting United States Trust, 431 U.S. at 22-23, 97 S.Ct. at 1518). If the state is a party to the contract, such deference is inappropriate, and the court may inquire whether a less drastic alteration of contract rights could achieve the same purpose and whether the law is reasonable in light of changed circumstances. United States Trust, 431 U.S. at 25-26, 30-32, 97 S.Ct. at 1519-20, 1521-23.
 
 
 36
 This court has recently applied the three-step analysis in Keystone Bituminous Coal Ass'n v. Duncan, 771 F.2d 707, 717 (3d Cir.1985), aff'd, --- U.S. ----, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987); and Troy Ltd. v. Renna, 727 F.2d 287, 297 (3d Cir.1984). We proceed to apply it to the law and contracts at issue here.
 
 B. Substantial Impairment
 
 37
 Ordinarily in Contract Clause cases, the contract that is claimed to be impaired is an express contract. See, e.g., United States Trust, 431 U.S. at 14, 17-18, 97 S.Ct. at 1513, 1515-1516 (covenant between New York and New Jersey and with bondholders to limit use of certain bond revenues retroactively repealed); Allied Structural Steel, 438 U.S. at 240, 98 S.Ct. at 2720 (state statute retroactively imposed requirements on pension fund in excess of those undertaken by terms of fund's prior contract). The only express contract which Hess claims is impaired is its agreement with Litwin under which Litwin provides employees to Hess at specified costs. However, the retroactive abolition of the borrowed employee doctrine neither alters nor affects the terms of that contract. Litwin can continue to provide Hess with borrowed employees, and thus that contract is not substantially impaired.
 
 
 38
 The absence of an express contract affected by the change does not end our inquiry because Hess argues that the retroactive amendment provision substantially impairs its implied contracts of employment with the employees borrowed from Litwin. The Supreme Court made clear in United States Trust that contract terms implied under state law are protected by the Contract Clause:
 
 
 39
 The obligations of a contract long have been regarded as including not only the express terms but also the contemporaneous state law pertaining to interpretation and enforcement. "This Court has said that 'the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms.' " Home Building & Loan Assn. v. Blaisdell, 290 U.S. 398, 429-430 [54 S.Ct. 231, 236-237, 78 L.Ed. 413] (1934), quoting Von Hoffman v. City of Quincy, 4 Wall. 535, 550 [18 L.Ed. 403] (1867). See also Ogden v. Saunders, 12 Wheat. , at 259-260, 297-298 [6 L.Ed. 606 (1827) ] (opinions of Washington and Thompson, JJ.). This principle presumes that contracting parties adopt the terms of their bargain in reliance on the law in effect at the time the agreement is reached.
 
 
 40
 431 U.S. at 19-20 n. 17, 97 S.Ct. at 1516 n. 17. If the Contract Clause reaches terms implied in a contract, it follows that it reaches implied contracts as well. This was the precise holding by the Supreme Court in Mississippi ex rel. Robertson v. Miller, 276 U.S. 174, 179, 48 S.Ct. 266, 268, 72 L.Ed. 517 (1928), where the Court stated, "after services have been rendered by a public officer under a law specifying his compensation, there arises an implied contract under which he is entitled to have the amount so fixed. And the constitutional protection [of the Contract Clause] extends to such contracts just as it does to those specifically expressed."
 
 
 41
 Our Vanterpool opinion was premised on our determination that there existed an "implied contract of hire between the borrowed employee and the borrowing employer." 766 F.2d at 122. Our holding was that a borrowing employer such as Hess could be a statutory employer under the Virgin Islands Workmen's Compensation Act and thereby exempt from tort suits by those borrowed employees who had consented to the contract of hire with Hess and who could be presumed to have acquiesced in the risks of the new employment. Id. at 127-28. The retroactive application provision would abolish Hess' insulation from tort liability for the work injuries of borrowed employees who filed suit before the enactment of the amendment. Thus, we must decide whether such a retroactive provision effects an impairment of the implied contract of hire between Hess and its employees.
 
 
 42
 Hess argues that workmen's compensation laws are treated as implied terms of contracts of employment. It points to ten jurisdictions so holding[2] and contends that the district court was bound to apply this approach because this is the rule of common law "generally understood and applied in the United States."[3]
 
 
 43
 The district court examined the conflicting schools of thought viewing workmen's compensation laws either as contractual or as based on the status of the employer-employee relationship. It opted for the latter position, stating that the workmen's compensation law is "incidental to the employment relationship and not an implied term of the employment contract." Prevost, 640 F.Supp. at 1224.[4] The court concluded that the retroactive application provision worked a change only in "the status of the employer-employee relationship" and did not effect an impairment of contractual obligations. 640 F.Supp. at 1223-24.[5]
 
 
 44
 In analyzing Hess' Contract Clause contention we must decide whether the implied contract of employment between Hess and its borrowed employees included as one of its terms the substitution of workmen's compensation benefits for the employees' common law tort remedies against their employer. Those jurisdictions that view the workmen's compensation laws as contractual would presumably hold that a borrowed employee's waiver of his or her common law remedies is an implied term of the contract between employer and employee. The status jurisdictions would presumably hold to the contrary. In making our determination as to whether waiver of tort remedies is a term of the contract, we believe it is more constructive for purposes of Contract Clause analysis to look to the expectations of the parties to the contract rather than to any formalistic classification.
 
 
 45
 Hess suggests that its contract with Litwin clearly reflects its expectation that its status as a borrowing employer under the Workmen's Compensation Act entitled it to the statutory immunity from tort liability to its borrowed employees. The Litwin contract imposes on Hess ultimate liability for claims from any occurrence resulting from the performance of Type I work by borrowed employees,[6] but imposes on Litwin the ultimate liability for claims from any occurrence resulting from the performance of Type II work by borrowed employees unless caused by the sole negligence of Hess.[7] The contract requires Litwin to maintain substantial comprehensive general liability insurance covering work classified both as Type I or Type II.
 
 
 46
 Although the contract requires Litwin to maintain workmen's compensation insurance, Nieves App. at 32, the comptroller of Hess filed an affidavit that avers that Hess reimburses Litwin for all payroll expenses for Type I personnel, including workmen's compensation contributions to the Government Insurance Fund, and that "[t]he expense of workmen's compensation contributions is one of the factors in the time and materials rate paid to Litwin for [the] services [of] Type I personnel while working for [Hess]." Weinman Affidavit, Nieves App. at 58. That affidavit is unrebutted, and thus we must accept the fact that Hess pays for the workmen's compensation insurance.
 
 
 47
 Such a payment is the recognized quid pro quo for the employer's insulation from tort liability to its employees. See Washington Metropolitan Area Transit Authority v. Johnson, 467 U.S. 925, 931-32, 104 S.Ct. 2827, 2831-32, 81 L.Ed.2d 768 (1984); Potomac Electric Power Co. v. Director, OWCP, 449 U.S. 268, 282 & n. 24, 101 S.Ct. 509, 516 & n. 24, 66 L.Ed.2d 446 (1980). It would be unrealistic to assume that Hess would have reimbursed Litwin for workmen's compensation insurance payments for Type I personnel unless Hess expected to benefit from the statutory tort immunity accruing to it as the statutory employer of those borrowed employees. The fact that Hess sought to assure itself of protection by an express provision in the contract mandating workmen's compensation insurance payments, together with the other insurance provisions allocating to Hess ultimate responsibility for Type I employees, demonstrates Hess' expectation that a term of the implied contract with the borrowed employees was its immunity from their tort suits.[8]
 
 
 48
 In Vanterpool, we considered the expectations of borrowed employees as to their loss of common law remedies. We held that a borrowed employee's consent to the implied contract of hire carried with it consent to the waiver of common law rights against the employer. 766 F.2d at 126-27. Of course, there may be a factual question as to a particular employee's status as a borrowed employee, an issue we discuss in Part III infra, but the concept that borrowed employees consent to a waiver of employer tort liability as a term of the implied contract of employment was the basis of the Vanterpool opinion, and is binding on us here. Thus, we conclude that tort immunity was a term of the implied contract.
 
 
 49
 That term of the contract is not necessarily protected from retroactive elimination. As the Court stated in United States Trust, "It is not always unconstitutional ... for changes in statutory remedies to affect pre-existing contracts." 431 U.S. at 20 n. 17, 97 S.Ct. at 1516 n. 17. Only a substantial impairment will trigger the next step in Contract Clause analysis. The substantial impairment inquiry requires us to consider whether Hess could justifiably expect that the legislature would not retroactively eliminate its tort immunity. In United States Trust, before determining that the elimination of a statutory covenant constituted an impairment of contractual obligations, the Court found it necessary to engage in:
 
 
 50
 a more particularized inquiry into the legitimate expectations of the contracting parties. The parties may rely on the continued existence of adequate statutory remedies for enforcing their agreement, but they are unlikely to expect the state law will remain entirely static. Thus a reasonable modification of statutes governing contract remedies is much less likely to upset expectations than a law adjusting the express terms of an agreement.
 
 
 51
 431 U.S. at 20-21 n. 17, 97 S.Ct. at 1517 n. 17 (emphasis added).
 
 
 52
 Similarly, in Allied Structural Steel, the Court looked to reliance in determining whether an employer's employment contract with its employees was impaired by a Minnesota law that retroactively imposed a pension funding obligation on employers who terminated their pension plan or closed their Minnesota office. The clauses of the employment contracts at issue in that case set out the employer's funding obligations and were drafted to comply with the then current law governing pensions. The employer's intention to rely on the clauses to limit its liability was evident. The question remained whether the employer could justifiably rely on the contractual limits in the face of changes in the statutory requirements. The Court held that it could:
 
 
 53
 [T]he company was free to terminate or amend the pension plan at any time. The company thus had no reason to anticipate that its employees' pension rights could become vested except in accordance with the terms of the plan. It relied heavily, and reasonably, on this legitimate contractual expectation in calculating its annual contributions to the pension fund.
 
 
 54
 438 U.S. at 245-46, 98 S.Ct. at 2723. The Court held that the impairment effected by the Minnesota statute was severe since it retroactively modified the company's obligation in an area where reliance was vital, id. at 246, 98 S.Ct. at 2723, and "impos[ed] a completely unexpected liability in potentially disabling amounts." Id. at 247, 98 S.Ct. at 2724.
 
 
 55
 The district court apparently believed that Hess could not reasonably expect continuing immunity even in pending cases because "the borrowed employee doctrine had only recently been adopted in the Virgin Islands." Prevost, 640 F.Supp. at 1224. However, that overlooks that there were no Virgin Islands cases interpreting the statute to exclude the borrowed employee doctrine. Under those circumstances, and particularly in light of the wide acceptance in the United States of the borrowed employee doctrine in workmen's compensation cases, see Vanterpool, 766 F.2d at 123, 125, Hess' reliance on immunity from tort liability to its borrowed employees was not unjustifiable.[9]
 
 
 56
 The employees argue that because Hess, Litwin and the employees contracted in a "heavily regulated" area, Hess could not justifiably rely on the continuity of the statutory scheme. They rely on our decisions in Galvan v. Hess Oil Virgin Islands Corp., 549 F.2d 281, 284-87 (3d Cir.1977), and Troy, Ltd. v. Renna, 727 F.2d at 287. In Galvan, we upheld retroactive extension of the statute of limitations for third party tort actions under the Workmen's Compensation Act. That case involved an issue of statutory interpretation; the Contract Clause was inapposite because there was no contract involved since suit was against third parties.
 
 
 57
 Troy did involve the Contract Clause, but we believe Troy does not govern this case. There we were dealing with a statutory extension of the length of a preexisting statutory tenancy. We suggested that such an alteration was "probably not an impairment at all" because when the landlord " 'purchased into an enterprise already regulated in the particular to which he now objects';" he could not justifiably expect that no alteration of the regulations would occur. Id. at 297 (quoting Veix v. Sixth Ward Building & Loan Ass'n, 310 U.S. 32, 38, 60 S.Ct. 792, 794, 84 L.Ed. 1061 (1940)). See also Energy Reserves, 459 U.S. at 416, 103 S.Ct. at 707 (where Kansas statute alters already regulated prices for natural gas, "reasonable expectations have not been impaired" by a change in those prices); Colonial Penn Insurance Co. v. Heckler, 721 F.2d 431, 442 (3d Cir.1983) (2 1/2 year interval between notice given by Secretary to the insurance company and issuance of regulations that made Medicare benefits secondary to coverage provided by automobile policies gave automobile insurance company time to ease the impact of the change, so that insurance company could not contend regulations "upset any justified expectations").
 
 
 58
 The instant case is more closely related to Allied Structural Steel than to Troy. Concededly, when the contracts at issue were entered into, Hess was aware that certain aspects of the treatment of borrowed employees under the Workmen's Compensation Act were subject to change by the legislature, but Hess had no reason to anticipate that the legislature would make such a drastic change as retroactive elimination of Hess' coverage under the Act as the employer of borrowed employees, thereby subjecting it retroactively to tort liability to its borrowed employees.
 
 
 59
 We view Hess' position as comparable to the employer in Allied Structural Steel who "had no reason to anticipate that its employees' pension rights could become vested except in accordance with the plan." 438 U.S. at 245-46, 98 S.Ct. at 2723. Hess' expectation that its contracts of employment with its borrowed employees, albeit implied, were covered under the Workmen's Compensation Act was not unreasonable. The retroactive application provision, by completely destroying this expectation, represents a substantial impairment of Hess' contractual expectations, and we must therefore proceed with the remainder of the three-step analysis set forth in Energy Reserves.
 
 
 60
 C. Public Purpose and the Adjustment of Rights
 
 
 61
 A finding that there has been an impairment "is merely a preliminary step in resolving the more difficult question whether that impairment is permitted under the Constitution." United States Trust, 431 U.S. at 21, 97 S.Ct. at 1517. That determination will depend on whether the statute can be justified on the basis of a significant and legitimate public purpose that reasonably accommodates the rights and responsibilities of the contracting parties. Id. at 22, 97 S.Ct. at 1517.
 
 
 62
 The Virgin Islands legislature's explanation for the 1986 bill abolishing the borrowed employee doctrine and applying that abolition to pending claims states that the bill is needed "to assist persons who are injured while on the job and to assist the Department of Labor Workmen's Compensation Division, in recouping monies it has expended on injured workmen from the wrongdoer." Bill No. 498, 16th Legislature (1986) (attached explanation), Nieves App. at 151.
 
 
 63
 The district court concluded that "[p]rotection of workmen's compensation resources as well as protection of Virgin Islands' workers are both significant and legitimate public purposes." Prevost, 640 F.Supp. at 1224. We do not understand Hess to dispute the district court's conclusion that elimination of the borrowed employee doctrine serves a legitimate public purpose. Instead, Hess limits its argument to the contention that there is no valid public purpose served by the retroactive application provision because this provision was special interest legislation aimed against Hess. In Energy Reserves, the Court explained that, "The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." 459 U.S. at 412, 103 S.Ct. at 705.
 
 
 64
 For purposes of the present case, we can consider the public purpose factor together with the final step in the Contract Clause analysis which requires the court to address whether the legislation is based upon "reasonable conditions and [is] of a character appropriate to the public purpose justifying its adoption." United States Trust, 431 U.S. at 22, 97 S.Ct. at 1518. Framed another way, this inquiry entails an "overall determination of reasonableness." Id. at 22 n. 19, 97 S.Ct. at 1518 n. 19.
 
 
 65
 Courts are required to defer to the legislature's judgment concerning the necessity and reasonableness of economic and social legislation. Id. at 22-23, 97 S.Ct. at 1517-18. The district court believed that the retroactive application provision was reasonable because it viewed the borrowed employee doctrine as having been adopted with the Vanterpool decision in 1985 and it construed the amendment as conforming Virgin Islands law "with workmen's compensation practice prior to Vanterpool." 640 F.Supp. at 1224-25. Hess argues that the district court applied too deferential a standard and that the retroactive application provision is unreasonable under any standard.
 
 
 66
 When the state is a contracting party, the legislative judgment is subject to stricter scrutiny than when the legislation affects only private contracts. United States Trust, 431 U.S. at 25-26, 97 S.Ct. at 1519-20. Hess recognizes that the contracts at issue are between private parties, but argues that because recoupment benefits the Virgin Islands government, it is the Government's self-interest which is at stake, and the stricter scrutiny is appropriate.
 
 
 67
 We are not convinced that heightened scrutiny is appropriate in this case. The workmen's compensation fund appears to be independent from other Virgin Islands funds. Funds recouped when a beneficiary recovers in a third-party tort action are not deposited in the Virgin Islands general treasury but go to replenish the fund for payment of future workmen's compensation benefits. See 24 V.I.C. 263, 265, 266. Moreover, in Keystone Bituminous Coal Ass'n v. Duncan, 771 F.2d at 717-18, we held that a more exacting inquiry was not required of legislation requiring miners to protect surface owners from subsidence damage notwithstanding waivers. The fact that one of the asserted purposes of the statute was "preserving the state's limited tax base" did not require treating the state as a contracting party. Id. at 718. The state's self-interest in its tax base is not dissimilar to its interest in preservation of the workmen's compensation fund. Accordingly, we will apply the deferential standard of review to make the requisite "overall determination of reasonableness."
 
 
 68
 In a due process context, the Supreme Court stated, "The retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justification for the latter may not suffice for the former." Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 17, 96 S.Ct. 2882, 2893, 49 L.Ed.2d 752 (1976). The same point is apt when considering the rationality of retroactive application of a statute for purposes of the Contract Clause. Legislation aimed retroactively to benefit or burden a few identifiable persons is particularly vulnerable to the charge that it is not reasonably related to the asserted public purposes.
 
 
 69
 In striking down the retroactive application of a Minnesota pension fund requirement in Allied Structural Steel, the Court stressed that the legislative history indicated that the statute had an "extremely narrow focus." 438 U.S. at 248, 98 S.Ct. at 2724. Moreover, the statute was drafted so that "its narrow aim was leveled, not at every Minnesota employer, not even at every Minnesota employer who left the State, but only at those who had in the past been sufficiently enlightened as voluntarily to agree to establish pension plans for their employees." Id. at 250, 98 S.Ct. at 2725. These factors contributed to the Court's decision that the statute "can hardly be characterized ... as one enacted to protect a broad societal interest rather than a narrow class." Id. at 248-49, 98 S.Ct. at 2724.
 
 
 70
 Here, as in Allied Structural Steel, the legislative history indicates that the legislature was aware that the major impact of the retroactive application provision would be on Hess. The official explanation appended by the legislature to the amendment states:
 
 
 71
 Take a situation where a Litwin employee is injured at Hess. Under the present law, the Courts say our Legislature intended not only to grant immunity to the injured worker's employer Litwin, but also to Hess. The Bill would avoid that.
 
 
 72
 Bill No. 498, 16th Legislature (1986) (attached explanation), Nieves App. at 151. Since Hess is the largest private employer in the Virgin Islands, the illustration alone might not suggest special legislation except that the legislative history also demonstrates that the legislature expressly sought to overturn application of the borrowed employee doctrine to the six cases pending against Hess.[10] Since the retroactive application provision was designed to abolish Hess' tort immunity on behalf of those six plaintiffs,[11] it can hardly be viewed as general legislation for the public welfare.
 
 
 73
 The legislature's aim directed to the pending plaintiffs' cases against Hess distinguishes this case from Energy Reserves Group, where the Court rejected a claim that retroactive legislation which applied only to a few major utility companies was special interest legislation similar to that in Allied Structural Steel:
 
 
 74
 Given the nature of the industry--sales to public utilities--it is impossible for any regulation not to have a major effect on a small number of participants. This differs from the statute under challenge in Allied Structural Steel Co., where a small number of employers were singled out from the larger group.
 
 
 75
 459 U.S. at 417 n. 25, 103 S.Ct. at 708 n. 25.
 
 
 76
 It also distinguishes the Fifth Circuit's decision in Louviere v. Marathon Oil Co., 755 F.2d 428 (5th Cir.1985), relied on heavily by the employees. The court in Louviere was interpreting a 1984 congressional amendment of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. Secs. 901-950, which was designed to overturn the Supreme Court decision in Washington Metropolitan Area Transit Authority v. Johnson, 467 U.S. 925, 104 S.Ct. 2827, 81 L.Ed.2d 768 (1984), interpreting that Act as making contractors who secured statutory compensation for employees of subcontractors immune from tort actions brought by those employees. The amendment repudiating such immunity was made retroactively applicable to all pending claims in order to allow all pending third-party suits to proceed under what Congress believed to be the proper interpretation of the Act.
 
 
 77
 In upholding the application of the amendment to pending cases against a due process challenge, the Fifth Circuit, in summary reasoning, relied only on the principle enunciated in United States v. The Schooner Peggy, 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801), that a change in law while a case is on direct review is to be given effect. Louviere, 755 F.2d at 430. Louviere did not present a Contract Clause issue, since that clause is not applicable to the federal government, and therefore cannot govern the issue before us because of the significant distinction the Supreme Court has made between Contract Clause cases and substantive due process cases. In Pension Benefit Guaranty Corp. v. R.A. Gray & Co., 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984), the Court contrasted the "limitations imposed on States by the Contract Clause with the less searching standards imposed on economic legislation by the Due Process Clauses." Id. at 733, 104 S.Ct. at 2720 (emphasis added). See also id. at 727 n. 6, 104 S.Ct. at 2716 n. 6.
 
 
 78
 Furthermore, cases applying the Schooner Peggy principle have specifically recognized that a change in law will not be applied to pending cases when such retroactive application produces "substantial inequitable results". For example, this court in Mineo v. Port Authority of New York & New Jersey, 779 F.2d 939, 943-46 (3d Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 3297, 92 L.Ed.2d 712 (1986), refused to retroactively apply the overtime provisions of the Fair Labor Standards Act to employees engaged in the business of mass transit notwithstanding the Supreme Court decision in Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), holding those employees were subject to the FLSA. We stated, "Inasmuch as the Port Authority encountered an unresolved issue of law, on which it took a reasonable position, retroactive application of Garcia to foreclose its reliance on National League of Cities [v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976) ] is not equitable." 779 F.2d at 946. Although the facts in this case are different, the principle that the Schooner Peggy line of cases will not be applied to cause "substantial inequitable results" is equally applicable.
 
 
 79
 This case, unlike Louviere, concerns legislative enactment of special interest legislation.[12] That purpose is apparent not only from the narrow aim evidenced in the legislative history discussed above, but also from the fact that the 1984 amendment to the Virgin Islands Workmen's Compensation Act had already effected the abolition of the borrowed employee doctrine on a prospective basis. In Allied Structural Steel, the Court stressed that the effective life of the state's pension legislation was extremely short because the problem addressed was treated in the pending ERISA legislation. 438 U.S. at 248-49 n. 21, 98 S.Ct. at 2724 n. 21. Here, the 1984 enactment of section 263a abolishing the borrowed employee doctrine in workmen's compensation cases satisfied the legislature's enunciated aim of protecting Virgin Islands' workers. As in Allied Structural Steel, there was no general welfare to be served by the 1986 retroactive application provision which could affect at most six or seven pending cases. Thus, this legislation "can hardly be characterized ... as [a law] enacted to protect a broad societal interest rather than a narrow class." Id. at 248-49, 98 S.Ct. at 2724.
 
 
 80
 Similarly, the retroactive application provision cannot be justified by the goal of recouping expenditures made by the workmen's compensation fund. Because we are not applying heightened scrutiny we do not rely on the fact, stressed by Hess, that there is already a statutory vehicle by which the fund may increase premiums of employers by up to 25 percent whenever claims chargeable to that employer exceed its premium payments, 24 V.I.C. 271(b)(4), which could presumably be applied to Litwin and passed through to Hess by it. Even under the deferential standard, if recouping past expenditures could justify a retroactively established cause of action the circumscription of the Contract Clause would be rendered practically meaningless. Almost any arrangement would then be subject to impairment in order to benefit a potentially faltering or floundering fund. While the need to keep the workmen's compensation fund on a sound financial basis may justify prospective legislation designed for that purpose, it cannot justify this type of retrospective legislation. In sum, after examining the asserted purposes of the retroactive application provision and the means chosen to accomplish them, we believe that this provision violates the Contract Clause.
 
 III.
 Questions of Fact
 
 81
 We have concluded that the district court did not err as a matter of law in holding that the borrowed employee doctrine was applicable in the Nieves, Taylor, Thomas and Cotto actions. Three of the injured employees, Nieves, Taylor and Cotto, contend that in any event the grant of summary judgment to Hess was inappropriate because there were questions of fact as to their status as borrowed employees.
 
 
 82
 Under Vanterpool, in order to be considered a borrowed employee, the employee:
 
 
 83
 must have consented to an express or implied contract of hire with the borrowing employer. Moreover, a borrowed employee's special employment must have been of a nature and of sufficient duration so that the employee may be presumed to have evaluated and acquiesced in the risks of his new employment.
 
 
 84
 766 F.2d at 128 (emphasis in original).
 
 
 85
 The district court granted summary judgment against Nieves (1) because his consent to a contract of hire was evidenced by the "rehire" form (also referred to as the "Hess loanee" form) signed by Nieves stating that he would work as a Hess loanee under Hess' control, direction and supervision, Nieves v. Hess Oil Virgin Islands Corp., No. 84-336, slip op. at 4 (D.V.I. Nov. 1, 1985), Nieves App. at 177, see p. infra, and (2) because Nieves' work at the Hess refinery for three months "provided him with ample opportunity to evaluate the risks of his employment." Id. at 5, Nieves App. at 178. This decision is consistent with Vanterpool, 766 F.2d at 127. Nieves contends that because he took instruction from an employee who, unknown to him, was actually also a Litwin loanee, there was an issue of fact as to whose employee he was at the relevant time. He conceded that this intermediary was working under the Hess superintendent. Nieves App. at 119-120. This contention was also considered and rejected in Vanterpool, where we stated, "It is undisputed that, at the time of his injury, Vanterpool was performing [Hess'] work, on [Hess'] property, and with the use of [Hess] equipment." 766 F.2d at 121 n. 3.
 
 
 86
 Nieves also contends that his signature on the loanee form dated June 27, 1983, Nieves App. at 61, was a forgery. The district court held that this failed to create an issue of fact because the signature on the loanee form "is remarkably similar to the signatures of the plaintiff that appear on numerous exhibits attached to his opposition to the motion for summary judgment". Nieves, slip op. at 2-3, Nieves App. at 175-76. Under Anderson v. Liberty Lobby, Inc., --- U.S. ----, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986), the court on a motion for summary judgment can decide whether the evidence "is so one-sided that one party must prevail as a matter of law." In addition to the similarity in signatures, the documents before the district court were admittedly executed by Nieves in connection with his employment on the same date as appears on the rehire form. On this record, the district court did not err in finding that Nieves' bald allegation of a forgery did not raise a genuine issue of material fact sufficient to preclude summary judgment.
 
 
 87
 Taylor does not challenge his signature on the Hess loanee form. Taylor had ample opportunity to evaluate the risks of his employment at Hess when he worked at Hess as a Litwin Type I employee on the prior occasions performing similar tasks. Taylor v. Hess Oil Virgin Islands Corp., No. 84-205, slip op. at 6 (D.V.I. Sep. 18, 1985), Taylor App. at 142. Taylor's challenge to summary judgment against him is limited to his argument that he cannot be considered a borrowed employee because he was not performing Type I work at the time of his injury, but was instead performing new construction under supervision of a Litwin supervisor. As in the Nieves case, the interposition of a Litwin intermediary when a Hess supervisor was in control does not signify that Hess was not the employer. We agree with the district court that the particular work performed by Taylor is not a determinant factor in deciding whether he was a borrowed employee. Taylor, slip op. at 4-5, Taylor App. at 140-41. Since the record supports the district court's determination that the Vanterpool test was met as to Taylor, summary judgment was appropriate.
 
 
 88
 To the extent that Cotto challenges summary judgment on the same ground as Taylor, the same considerations apply. Cotto raises an additional contention. He argues that he could not consent to the loanee form because he was illiterate and could not read English. The district court held that notwithstanding Cotto's illiteracy, he is bound to the legal consequences of signing the form. Cotto v. Hess Oil Virgin Islands Corp., No. 84-318, slip op. at 6 (D.V.I. Nov. 1, 1985), Cotto App. at 134. Moreover, the court stated that "even assuming arguendo that Cotto did not give his express consent to work as the borrowed employee of HOVIC, his repeated rehirings as a Litwin Type I employee indicates implied consent to work for the borrowing employer." Id., Cotto App. at 134. We agree. In light of the record which supports the district court's conclusion that there was no genuine issue of fact that Cotto was a borrowed employee, summary judgment was appropriate.
 
 IV.
 Conclusion
 
 89
 For the reasons set forth above, we will affirm the district court's grant of summary judgment to Hess in the Nieves, Cotto, Taylor, and Thomas cases. In Prevost and Scotland, although the district court denied summary judgment for reasons that we cannot affirm, it did not address the factual issue of the status of those plaintiffs as borrowed employees. Therefore, we will remand those cases for further proceedings in accord with this opinion.
 
 
 90
 STAPLETON, Circuit Judge, dissenting.
 
 
 91
 The court concludes that a prior version of the Virgin Islands Workmen's Compensation Act, as interpreted by this court, became an implied term of an implied employment contract subject to contract clause protection and that the Virgin Islands legislature is barred by the contract clause from amending the Act to retroactively correct what it perceived to be an erroneous interpretation of that statute. I respectfully dissent because the corrective amendment did not impair any contract-based expectation and because, even if that amendment could be said to impair such an expectation, it did not do so in violation of the contract clause.
 
 I.
 
 92
 As correctly noted by the court, the Supreme Court has established a three-step analysis for determining whether retroactive state legislation constitutes an impermissible impairment of contractual rights. Energy Reserve Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983). The first step requires that two questions be answered: Does the plaintiff have contract-based rights and have those rights been substantially impaired? Id. at 411, 103 S.Ct. at 764. Only if both of these questions are answered in the affirmative does a court proceed in the second step to inquire whether the legislation occasioning the substantial impairment has a "legitimate public purpose." Id. Finally, the court determines whether the impairment is reasonable and "appropriate to the public purpose" of the legislation. Id. at 412, 103 S.Ct. at 705.
 
 
 93
 A. The Absence of a Contract Right.
 
 
 94
 The "purpose of the [Contract] Clause [is] clear: to encourage trade and credit by promoting confidence in the stability of contractual obligations." United States Trust Co. v. New Jersey, 431 U.S. 1, 15, 97 S.Ct. 1505, 1514, 52 L.Ed.2d 92 (1977). Its "primary focus [is] upon legislation ... designed to repudiate or adjust pre-existing debtor-credit or relationships that obligors [are] unable to satisfy." Keystone Bituminous Coal Association v. DeBenedictis, --- U.S. ----, 107 S.Ct. 1232, 1251, 94 L.Ed.2d 472 (1987). Given that focus, it is not surprising that the Supreme Court has stated that the "term 'contract' is used in the Constitution in its ordinary sense, as signifying the agreement of two or more minds, for considerations proceeding from one to the other, to do, or not to do certain acts. Mutual assent to its terms is of its very essence." Louisiana ex rel. Folsom v. Mayor of New Orleans, 109 U.S. 285, 288, 3 S.Ct. 211, 213, 27 L.Ed. 936 (1883); accord Crane v. Hahlo, 258 U.S. 142, 146, 42 S.Ct. 214, 215, 66 L.Ed. 514 (1922); Morley v. Lake Shore Railway Co., 146 U.S. 162, 169, 13 S.Ct. 54, 57, 36 L.Ed. 925 (1892); see Hale, The Supreme Court and the Contract Clause: II, 57 Harv.L.Rev. 621, 621-28 (1944).
 
 
 95
 Contract clause cases have focused upon laws alleged to impair consensually assumed contractual obligations. See, e.g., Keystone Bituminous Coal Association v. DeBenedictis, --- U.S. ----, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) (law affecting express private contracts); Exxon Corp. v. Eagerton, 462 U.S. 176, 103 S.Ct. 2296, 76 L.Ed.2d 497 (1983) (same); Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983) (same); Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978) (same); United States Trust Co. v. New Jersey, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977) (law affecting express contract between bondholders and state). In contrast, Hess in this case urges that we employ the contract clause to strike down a law altering a nonconsensual regulation imposed pursuant to the police power of the state. I would decline to do so.
 
 
 96
 Although courts in some contexts have invoked a legal fiction that contracting parties incorporate certain kinds of statutory law in their contract, to indulge in that fiction in the context of contract clause analysis as my colleagues have done requires extension of contract clause protection far beyond the limits that the Supreme Court has prescribed. In Louisiana ex rel. Folsom v. Mayor of New Orleans, 109 U.S. 285, 3 S.Ct. 211, 27 L.Ed. 936 (1883), that Court refused to sanction the use of a similar legal fiction to extend contract clause protection beyond expectations based on mutual assent:
 
 
 97
 A judgment for damages, estimated in money, is sometimes called by text writers a specialty or contract of record, because it establishes a legal obligation to pay the amount recovered; and, by a fiction of law, a promise to pay is implied where such legal obligation exists.... But this fiction cannot convert a transaction wanting the assent of the parties into one which necessarily implies it.... The prohibition of the federal Constitution was intended to secure the observance of good faith in the stipulation of parties against any State action. Where a transaction is not based upon any assent of parties, it cannot be said that any faith is pledged with respect to it; and no case arises for the operation of the prohibition.
 
 
 98
 Id. at 288, 3 S.Ct. at 213.
 
 
 99
 In light of the purpose of the contract clause, the better-reasoned cases hold that workers' compensation laws are simply state regulation of the employment relationship. Representative of these cases is McAllister v. Board of Education, 79 N.J.Super. 249, 191 A.2d 212 (1963), aff'd, 42 N.J. 56, 198 A.2d 765 (1964), in which the court reasoned:
 
 
 100
 Although the rights and liabilities of employer and employee under the Workmen's Compensation Act have been called "contractual in nature" and "a definite statutory status or relationship which is in essence contractual," they are not truly contractual. The courts have used the term "contract" in workmen's compensation cases much as they have used that term when speaking of marriage "contracts." In employment, like marriage, the parties must agree to enter the relationship, but once they do, the law dictates to them their rights and liabilities....
 
 
 101
 The net result of all this is that the workmen's compensation "contract" includes everything that the Legislature and the courts say it shall include, whether added before or after the injury.
 
 
 102
 Id. 191 A.2d at 217-18 (citations omitted); accord Price v. All American Engineering Co., 320 A.2d 336, 339 (Del.1974); cases cited by the court at 1245 n. 4. Cudahy Packing Co. v. Parramore, 263 U.S. 418, 44 S.Ct. 153, 68 L.Ed. 366 (1923), albeit not a contract clause case, lends support to this view of workmen's compensation laws. In that case, the Supreme Court recognized:
 
 
 103
 Workmen's compensation legislation rests upon the idea of status, not upon that of implied contract.... The liability is based, not upon any act or omission of the employer, but upon the existence of the relationship which the employee bears to the employment....
 
 
 104
 Id. at 423, 44 S.Ct. at 154.
 
 
 105
 If a workers' compensation statute is held to qualify for contract clause protection despite the absence of expectations based on "mutual assent," Louisiana ex rel. Folsom, 109 U.S. at 288, 3 S.Ct. at 213, the same must be said for state legislation concerning workplace safety, equal employment opportunity, unemployment insurance, maximum working hours, and the like. Yet, I find nothing in 200 years of Supreme Court caselaw that remotely suggests that the contract clause was intended to restrict legislative discretion regarding public policy in these areas. Similarly, I find no warrant for restricting legislative discretion concerning the way in which victims of employment-related torts will be compensated.
 
 
 106
 Although the court's opinion initially acknowledged that a successful contract clause challenge must be predicated on "contractual rights or obligations altered by the law," p. 1243, the court ultimately fails to identify any expectation of Hess based on the mutual assent of Hess and its borrowed employees. For this reason, I find the court's opinion unpersuasive.
 
 
 107
 The court first relies upon United States Trust Co. v. New Jersey, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977), and Mississippi ex rel. Robertson v. Miller, 276 U.S. 174, 48 S.Ct. 266, 72 L.Ed. 517 (1928), for the proposition that the contract clause reaches "terms implied in a contract" and "implied contracts as well." p. 1244. United States Trust Co. held that New Jersey and New York could not repeal a covenant in the bonds of the Port Authority of New York restricting the ability of the Authority to subsidize rail transportation from revenues pledged to secure those bonds. No implied terms were involved. The import of the footnote quoted by my colleagues is that, in the words of the Supreme Court, "statutes governing the interpretation and enforcement of contracts may be regarded as forming part of the obligation of contracts made under their aegis." 431 U.S. at 17 n. 14, 97 S.Ct. at 1515 n. 14 (emphasis supplied). It is one thing to extend contract clause protection to legislation governing the interpretation and enforcement of contracts in effect at the time the contract is formed. Such laws are undoubtedly relied upon by the parties when they contract. It is very different to extend contract clause protection to rights conferred by social legislation and the Supreme Court has not done so.
 
 
 108
 It should also be noted that the "incorporation rationale" in United States Trust Co. would not support the theory advanced by Hess and adopted by the court even if it were not limited to laws governing the interpretation and enforcement of contracts. The incorporation rationale, being grounded in the expectations of contracting parties, applies only to laws in effect when the contract is made. See United States Trust Co., 431 U.S. at 19 n. 17, 97 S.Ct. at 1516 n. 17. As I understand it, Hess concedes that a state legislature may make a new workers' compensation law or an amendment to an existing one applicable to employment contracts entered into before its enactment so long as the amendment comes before an employee is injured. Hess could not successfully argue otherwise. As the Supreme Court observed in Exxon Corp. v. Eagerton, 462 U.S. 176, 103 S.Ct. 2296, 76 L.Ed.2d 497 (1983):
 
 
 109
 The Contract Clause does not deprive the States of their "broad power to adopt general regulatory measures without being concerned that private contracts will be impaired, or even destroyed, as a result." United States Trust Co. v. New Jersey, [431 U.S. 1, 22, 97 S.Ct. 1505, 1517, 52 L.Ed.2d 92 (1977) ]. As Justice Holmes put it: "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them. The contract will carry with it the infirmity of the subject matter." Hudson Co. v. McCarter, 209 U.S. 349, 357 [28 S.Ct. 529, 531, 52 L.Ed. 828] (1908). Thus, ... a workmen's compensation law may be applied to employers and employees operating under pre-existing contracts of employment that made no provision for work-related injuries, New York Central R. Co. v. White, 243 U.S. 188 [37 S.Ct. 247, 61 L.Ed. 667] (1917).
 
 
 110
 Id. at 190, 103 S.Ct. at 2305 (footnotes omitted). Hess's argument is not that it had the right to expect tort immunity based on the workers' compensation law in effect at the time of contracting, but rather that the workers' compensation law became immutable, and Hess's immunity thereunder vested, at the time of injury. This highlights the fact that Hess's expectation was not contract-based. Rather, its theory is that its statute-based right of tort immunity somehow became vested at the time of injury.
 
 
 111
 Although Mississippi ex rel. Robertson uses the phrase "implied contract," the Court did not there extend contract clause protection to a situation lacking expectations based on mutual assent. This is apparent from that portion of the opinion immediately following the portion quoted by the court:
 
 
 112
 The selection of plaintiff to be the Revenue Agent amounted to a request or direction by the State that he exert the authority and discharge all the duties of that office. In the performance of services so required of him plaintiff made the investigations and brought the suits to discover and collect the delinquent taxes. Under the statutes then in force as construed by the highest court of the State, he thereupon became entitled to the specified percentages of the amounts subsequently collected on account of the taxes sued for. The retroactive application of c. 170 would take from him a part of the amount that he had theretofore earned. That would impair the obligation of the implied contract under which he became entitled to the commissions.
 
 
 113
 276 U.S. at 179, 48 S.Ct. at 268. Accordingly, the holding of Mississippi ex rel. Robertson is that the contract clause protects a unilateral contract once it has been consummated through performance by the promisee.
 
 
 114
 The court's decision does not rest on these venerable precedents, however. Rather, in making its "determination as to whether waiver of tort remedies [by the borrowed employees] is a term of the contract," the court looks "to the expectations of the parties to the contract rather than to any formalistic classification." P. 1245. This puts the cart before the horse. Although it makes sense to look to the contract-based expectations of the parties to determine whether there has been a substantial impairment of a contractual relationship, expectations do not necessarily evidence a contractual relationship. Life engenders many expectations; the contract clause protects only expectations arising from mutual assent.
 
 
 115
 The court's failure to focus on the necessity of mutual assent causes it to virtually ignore the implied contract between Hess and the borrowed employees. Its discussion of the expectations of the parties focuses almost solely on the agreement between Hess and Litwin.[1] Because the borrowed employees did not give their assent to that contract, Hess's expectations in entering it are irrelevant to the question of whether the contract clause applies in this situation.
 
 
 116
 More importantly, however, any relevant expectations of Hess were based neither on its contract with Litwin nor on its implied contract with the borrowed employees. To the extent Hess had any expectations of immunity from tort liability to its borrowed employees when it initiated its arrangement with Litwin and borrowed the plaintiff employees, that expectation could only have arisen from a hope that it would be able to persuade the courts to adopt an interpretation of the Virgin Islands Act that they had given no indication they were prepared to embrace. This is simply not the kind of expectation the contract clause was intended to protect.
 
 
 117
 In the final analysis, the court's conclusion is based on the assertion that "the concept that borrowed employees consent to a waiver of employer tort liability as a term of the implied contract of employment was the basis of the Vanterpool opinion, and is binding on us here." P. 1246. There is no little irony in this conclusion. In Vanterpool, we reversed the district court's holding that a borrowed employee could not be stripped of his common law rights against his borrowing employer without a showing that he had given knowing assent to a waiver of those rights. Although we noted that there was an "implied contract" of employment between a borrowed employee and a borrowing employer for purposes of applying the Virgin Islands Act, we expressly held that the waiver of tort liability came about by operation of the statute and not as a result of the borrowed employee's assent to its inclusion in the implied contract of employment:
 
 
 118
 Because the foundation of workers' compensation rests on the contract for hire, the threshold inquiry must be whether the employee made such a contract with the borrowing employer.... This inquiry, however, is different from whether the employee consented to accept the compensation scheme as well. As previously noted, where the scheme is mandatory, it conditions all employment. The borrowed employee may or may not make an express or implied contract for hire with a borrowing employer, but once such a contract is made, there is no secondary inquiry as to whether the employee consents to the application of the compensation scheme itself.
 
 
 119
 766 F.2d at 126.
 
 
 120
 Workers' compensation is wholly a creature of statute, not contract. For this reason, neither Hess nor the court is able to identify a contract right that is impaired by the challenged amendment. Accordingly, Hess should not prevail.
 
 B. The Absence of Substantial Impairment
 
 121
 Assuming nonetheless that the pre-1984 version of the Virgin Islands Act was a protected implied term of the implied employment contract between Hess and its borrowed employees, application of the amended Act to all claims pending on or filed after the effective date of the challenged amendment does not violate the contract clause. Hess bears the burden of demonstrating that the amendment "substantially impaired" its contractual rights or obligations. Cf. National Railroad Passenger Corp. v. Atchison, Topeka & Santa Fe Railway Co., 470 U.S. 451, 472, 105 S.Ct. 1441, 1455, 84 L.Ed.2d 432 (1985). "Minimal alteration of contractual obligations may end the inquiry at its first stage." Allied Structural Steel Co., 438 U.S. at 245, 98 S.Ct. at 2723. The severity of impairment is measured by the law's effect on the legitimate expectations and reliance interests of the contracting parties. Id.; Energy Reserves Group, 459 U.S. at 411, 103 S.Ct. at 704; United States Trust Co., 431 U.S. at 20 n. 17, 97 S.Ct. at 1516 n. 17. "In determining the extent of the impairment, we are to consider whether the industry the complaining party has entered has been regulated in the past." Energy Reserves Group, 459 U.S. at 411, 103 S.Ct. at 704.
 
 
 122
 When we focus upon Hess's legitimate expectations, it is important to remember that the Virgin Islands Act, even if conceived as being incorporated into every employment contract, nevertheless exists solely by virtue of legislation adopted by the Virgin Islands legislature. I believe Hess can have had no legitimate expectation that the statutory scheme at any given point in time would remain unchanged, and, accordingly, would hold, in the alternative, that there has been no substantial impairment of a legitimate expectation.
 
 
 123
 The court candidly acknowledges that Hess could not reasonably expect the Act to remain unchanged. It asserts, however, that "Hess had no reason to anticipate that the legislature would make such a drastic change as retroactive elimination of [its] coverage under the Act as the employer of borrowed employees." P. 1248. I do not agree that Hess had a legitimate expectation of being free from retroactive change.
 
 
 124
 Hess negotiated its contract with Litwin in 1977. That contract was last amended in 1980. The latest accident which is the subject of these suits occurred on May 31, 1984. As of that date, there was some reason to believe that the borrowed employee doctrine did not apply in the Virgin Islands.[2] There was no case adopting that doctrine for the Virgin Islands and no case providing a basis for predicting that it would be adopted. The most that can be said is that the issue was an open one when these accidents occurred. Accordingly, whichever assumption Hess made about this issue when it planned its affairs during the period before the district court decision in Vanterpool on June 7, 1984, it had to expect that a court might decide the other way and, in the normal course, apply its ruling to accidents which had previously occurred.
 
 
 125
 In addition, Hess knew that it faced the possibility of retroactive legislative action. Whichever way the court decision went, Hess knew that the Virgin Islands legislature could have the last word. Not only did Hess know that the legislature had periodically amended the Act in the past, it had specific reason to know that the legislature had not hesitated to revise the Act retroactively to cure a judicial interpretation of the Act with which it disagreed. In response to a Third Circuit interpretation of the Act's provision governing liability of third party tortfeasors that shortened the generally applicable two-year statute of limitations, see Berkeley v. West Indies Enterprises, Inc., 480 F.2d 1088 (3d Cir.1973), the Virgin Islands legislature amended the provision to retroactively apply a two-year standard. In Galvan v. Hess Oil Virgin Island Corp., 549 F.2d 281 (3d Cir.1977), this court upheld the retroactivity of that change without discussion. Id. at 286.
 
 
 126
 Because the concept of giving contract clause protection to statutory rights unrelated to the interpretation and enforcement of contracts is a novel one, there are few cases that address the issue of whether "legitimate expectations" in contract clause analysis must include the possibility of statutory amendments. This court recently addressed that issue, however, after suggesting that legislatively created rights are not protected by the contract clause. In terms of the absence of both substantial impairment and contract-based expectations, I find Hess's present position comparable to, but less sympathetic than, the landlord in Troy Ltd. v. Renna, 727 F.2d 287 (3d Cir.1984). In that case, New Jersey's Anti-Eviction Act, enacted in 1974, created a grace period which in effect extended the term of a tenant's lease when the landlord failed to renew because of plans to convert to condominiums. In 1981, the New Jersey legislature enacted the Tenancy Act to enhance the protection of certain senior citizens and disabled persons against evictions resulting from condominium conversions. The effect of qualifying for a "protected tenancy" under the Act was to obtain the right to remain as a tenant in a converted unit for up to 40 years beyond any period already authorized by the Anti-Eviction Act. The Tenancy Act also limited the magnitude of rent increases during the "protected tenancy." The Act conferred discretion on New Jersey courts to apply its provisions to buildings that were converted before the effective date of the Act.
 
 
 127
 Even though the Act authorized retroactive modification of the rights of parties to lease contracts, this court sustained its validity. In doing so, we noted the absence of contract-based expectations as well as the lack of substantial impairment to legitimate expectations:
 
 
 128
 [I]t is doubtful that any impairment of a contractual relationship has occurred. The Tenancy Act only enlarged, for senior citizens and the disabled, a preexisting statutory tenancy which came into operation as a matter of law. Prior to the enactment of the Tenancy Act, New Jersey had already placed significant limitations upon the rights of owners of multiple dwellings to define the landlord-tenant relationship solely in terms of contract.... Thus, beginning in 1974 the terms of the landlord-tenant relationship were specified to a large extent by statute. The Tenancy Act only operates to protect those statutory tenants whose relationship with their landlord has already become non-consensual by virtue of the Anti-Eviction Act. That is, the Tenancy Act simply enlarges the terms of a statutory tenancy already created by the Anti-Eviction Act. All of the plaintiffs acquired their interests in the Springfield complex after the Anti-Eviction Act went into effect. Such an enlargement of an already-regulated statutory tenancy is probably not an impairment at all. As the Supreme Court held in Veix v. Sixth Ward Building & Loan Ass'n., 310 U.S. 32, 38 [60 S.Ct. 792, 794, 84 L.Ed. 1061], ... (1940), "[w]hen he purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further legislation upon the same topic."
 
 
 129
 727 F.2d at 297.
 
 
 130
 In Troy, we distinguished Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978), relied upon here by the court, based on a similar analysis:
 
 
 131
 Spannaus deals with the modification of an existing contractual relationship voluntarily arrived at by negotiation between employer and employee. The Tenancy Act, in contrast, involves the modification of the terms of a non-contractual statutory tenancy previously imposed by state law. In Spannaus, the Minnesota legislature entered a field it had never before sought to regulate; New Jersey, to the contrary, regulated statutory tenancies following the expiration of a contractual lease beginning in 1974, and the plaintiffs purchased subject to those limitations....
 
 
 132
 727 F.2d at 299.
 
 
 133
 Here, similarly, any tort immunity Hess had was solely a matter of statute and the challenged amendment to that statute did not frustrate any legitimate expectation of Hess that it could count on such immunity remaining unaltered by the legislature.
 
 
 134
 C. Public Purpose and Reasonableness.
 
 
 135
 The official explanation attached to the challenged amendment states in substantial part:
 
 
 136
 This bill is needed to assist person [sic] who are injured while on the job and to assist the Department of Labor Workmen's Compensation Division, in recouping monies it has expended on injured workmen from the wrongdoer.
 
 
 137
 This need arises because the courts have been interpreting Section 284 of Title 24 of the Workmen's Compensation Act to grant immunity not only to a worker's immediate employer, but also to secondary employers although the Legislature never intended immunity for these secondary wrongdoers.
 
 
 138
 Other courts have made this bad interpretation, but it was quickly cured by other legislatures. Last June in Washington Metro Area Transit v. Johnson, 467 U.S. 925, 104 S.Ct. 2827, 81 L.Ed.2d 768 (1984) the United States Supreme Court interpreted the Federal Workmen's Compensation Act (LSHW) [sic] in such a manner as to grant immunity not only to an employee's immediate employer but to a remote secondary employer. The Congress became aware immediately of this wrong interpretation of its Act and within ninety days Congress amended the Federal Workmen's Compensation Act to avoid this interpretation.
 
 
 139
 This bill uses the same language Congress used when amending its Act....
 
 
 140
 By this proposed bill this defect can be cured.
 
 
 141
 Take a situation where a Litwin employee is injured at Hess. Under the present law, the Courts say our Legislature intended not only to grant immunity to the injured worker's employer Litwin, but also to Hess. The Bill would avoid that.
 
 
 142
 This is important not only to the injured workers, but to the Department of Labor because under the bill, for example, if the Litwin employee is badly hurt as a result of the negligence of Hess, and the employee has collected $25,000.00 in workmen's compensation benefits, if he can sue Hess for his injury, the first $25,000.00 of his recovery is paid back to Workmen's Compensation. This has enabled the Department of Labor in the past to maintain its ability to pay claims without undue assistance from the General Fund. The present existing interpretation would cut off that needed supply of revenue.
 
 
 143
 Bill No. 498, 16th Legislature (1986) (attached explanation), Nieves App. at 151-52.
 
 
 144
 The Virgin Islands legislature here articulates three public purposes that support retroactive application of the amendment; to cure Vanterpool' § adoption of the borrowed employee doctrine so as not to exclude any of the intended beneficiaries of the right to sue borrowing employers; to assist injured workers; and to assist the Commissioner of Labor in recouping sums paid to workers injured by third party tortfeasors. Although I believe each of these public purposes would suffice as a basis for sustaining the amendment, I need address only one.
 
 
 145
 The court expressly concedes that there is a public purpose to prospective abrogation of borrowing employer immunity. As it correctly notes, the theory of the Act is that an employee surrenders his or her common law right to sue his or her employer in tort in exchange for the more certain, though more limited, remedy provided by the Act. As indicated in the above-quoted explanation, the original intent of the Virgin Islands legislature was to effect this exchange between the employee and his or her immediate employer, but not to require the employee to surrender his or her common law right against a second employer when he or she would receive no additional consideration from anyone for that surrender. Although one can make arguments for a contrary policy, it is clearly rational to conclude that the public interest of the Virgin Islands population is better served by denying immunity to the borrowing employer. Having reached this conclusion, I fail to see how the court can find that there is no public purpose supporting the retroactive application provision.
 
 
 146
 All victims of negligence on the part of Virgin Islands borrowing employers were intended to be beneficiaries of the limits that the legislature thought it had placed on the exclusive remedy provision of the Act. The courts, albeit unintentionally, frustrated the legislature's intent and deprived some intended beneficiaries, like Mr. Vanterpool, of the benefits they were intended to have. Not surprisingly, when the legislature attempted to set the courts straight, it tried to save the rights of as many of the intended class of beneficiaries as it reasonably could. Given that there is a conceded public interest in employees having the intended benefits, this effort cannot be said to be unsupported by a public purpose.
 
 
 147
 Contrary to the assertion of the court, this is not special interest legislation whether looked at from the viewpoint of those burdened or those benefitted. The Virgin Islands legislature acted broadly to abrogate the borrowed employee doctrine for all employees and all employers for all time, the past, the present, and the future. Nor is there any reason to credit Hess's assertion that only a handful of plaintiffs are benefitted and only one employer burdened by the retroactive aspects of the statute. It was impossible at the time the records in these cases were developed to determine how many would be benefitted and how many burdened. The amendment applies to "(1) claims filed after the effective date of this Act; and (2) claims pending as of the effective date of this Act; regardless of when the accident which gave rise to the claim occurred." Bill No. 498, Sec. 2(b), 16th Legislature (1986), Nieves App. at 151. The size of the first group was not ascertainable. Those affected by the retroactive provision of the statute may not be numerous. Given the applicable two-year statute of limitations, it is unlikely that many viable claims were saved by the 1986 amendment that were not already saved by the 1984 amendment. But the important thing for present purposes is that neither Hess nor the plaintiffs were singled out for special treatment.
 
 
 148
 Hess cannot plead that it is the target of legislation solely because it is the biggest private employer in the Virgin Islands and thus the most heavily affected. In Energy Reserves Group, the Court noted that, "[g]iven the nature of the industry--sales to public utilities--it is impossible for any regulation not to have a major effect on a small number of participants." 459 U.S. at 418 n. 25, 103 S.Ct. at 708 n. 25. Declining to find the legislation in that case to be for the benefit of special interests, the Court noted that there was no "indication that the Kansas political process had broken down." Id. There is no indication in this record that the Virgin Islands political process had broken down or that employers in general and Hess in particular were denied a hearing in that process; indeed, the Governor's veto of the retroactive application amendment suggests that Hess's concerns were not ignored.
 
 
 149
 The Virgin Islands Act is a creation of the Virgin Islands legislature. When a legislature declares its belief that a court has misunderstood its creation, and the assertion of that belief is plausible, the courts have consistently recognized the legislature's right to cure the court's erroneous interpretation retroactively to the date of that interpretation (a fortiori, to pending cases). E.g., Board of Education of East Windsor Regional School District v. Diamond, 808 F.2d 987, 995-96 (3d Cir.1986) (upholding Congress' retroactive cure of Supreme Court's interpretation of Education of the Handicapped Act); Temple University v. United States, 769 F.2d 126, 134-35 (3d Cir.1985) (upholding Congress' retroactive cure of Supreme Court's interpretation of "wages" for purposes of the Federal Insurance Contributions Act against due process challenge), cert. denied, --- U.S. ----, 106 S.Ct. 2914, 91 L.Ed.2d 544 (1986); Canisius College v. United States, 799 F.2d 18, 27 (2d Cir.1986) (same), cert. denied, --- U.S. ----, 107 S.Ct. 1887, 95 L.Ed.2d 495, 8 Employee Benefits Cas. (BNA) 1488 (1987); Louviere v. Marathon Oil Co., 755 F.2d 428, 430 (5th Cir.1985) (upholding Congress' retroactive cure of Supreme Court's interpretation of Longshoreman's and Harbor Workers' Compensation Act against due process challenge); Long v. United States Internal Revenue Service, 742 F.2d 1173, 1183-84 (9th Cir.1984) (upholding Congress' retroactive cure of Ninth Circuit's interpretation of statutory exemption to Freedom of Information Act against due process challenge); Thomas v. Carnegie-Illinois Steel Corp., 174 F.2d 711, 713 (3d Cir.1949) (agreeing with Battaglia v. General Motors Corp., 169 F.2d 254, 259-61 (2d Cir.), cert. denied, 335 U.S. 887, 69 S.Ct. 236, 93 L.Ed. 425 (1948), that Congress' retroactive cure of Supreme Court's interpretation of Fair Labor Standards Act did not violate due process); Abshire v. Potter, 179 Cal.App.3d 73, 224 Cal.Rptr. 312 (1986) (upholding against due process and contract clause challenge California legislature's retroactive cure of U.S. Supreme Court's interpretation of federal law that was cured prospectively by Congress), cert. denied, --- U.S. ----, 107 S.Ct. 1262, 94 L.Ed.2d 124 (1987); Sanelli v. Glenview State Bank, 108 Ill.2d 1, 90 Ill.Dec. 908, 483 N.E.2d 226 (1985) (upholding against due process and contract clause challenge an Illinois legislature's retroactive cure of Illinois Supreme Court decision); see also J. Nowak, R. Rotunda & J. Young, Constitutional Law 473 (2d Ed.1983) ("[t]he category of cases where the constitutionality of curative statutes is an issue presents another area where the Court will almost always sustain retroactive legislation.").
 
 
 150
 I am cognizant of the fact that most of the above-cited cases deal with federal legislation and thus involve only due process, rather than contract clause, analysis. I am also aware of Justice Brennan's admonition that the Supreme Court has "never held ... that the principles embodied in the Fifth Amendment's Due Process Clause are coextensive with prohibitions existing against state impairments of pre-existing contracts." Pension Benefit Guarantee Corp. v. R.A. Gray & Co., 467 U.S. 717, 733, 104 S.Ct. 2709, 2719, 81 L.Ed.2d 601 (1984). Nevertheless, I do not believe the Supreme Court's contract clause analysis would lead it to conclude that retroactive curative amendments in circumstances of this kind are either unsupported by a public purpose or effect an unreasonable accommodation between the public interest and contractual expectations. The Supreme Court knows only too well that statutory interpretation is an inexact science and that legislative intent is not difficult to misconstrue. For this reason, I think it unlikely that the Supreme Court will deny to state and territorial legislatures the curative power it has consistently accorded Congress.
 
 
 151
 If contract clause analysis were applicable in situations of this kind, I would hold that where a state or territorial legislature has acted to retroactively cure a judicial misinterpretation of one of its statutes, it need not show a public purpose and reasonable accommodation of interests independent of the legislature's desire to cure the court's misinterpretation without excluding some of the intended beneficiaries of the statute. All that need be shown is that there is a public purpose supporting the substantive rule embodied in the statute as corrected, as there clearly is here, and that it is plausible for the legislature to claim that that rule has been its intent all along, which it clearly is here. Accordingly, I would conclude in this case that the retroactive application of the amendment does not violate the contract clause.
 
 III.
 
 152
 Because I find the borrowed employee doctrine inapplicable in these cases, I have no occasion to address the issues discussed in Section III of the court's opinion.
 
 
 
 [1]
 Under the agreement, Type I work is defined as that performed by Litwin employees who "have been loaned to HOVIC and are under HOVIC's direct supervision, direction and control." Nieves App. at 24. Type II work is defined as that over which Litwin "has responsibility for direct supervision, direction and control." Nieves App. at 24-25
 
 
 [2]
 Seven of the jurisdictions cited by Hess have held retroactive amendments of workmen's compensation laws unconstitutional impairments of rights arising from employment contracts. See Mitchell v. United States Fidelity and Guaranty Co., 206 F.Supp. 489, 490 (E.D.Tenn.1962); Horton v. Fleming Co., 3 Kan.App.2d 121, 590 P.2d 594, 596-97 (1979); Cooper v. Wicomico County, Dept. of Public Works, 278 Md. 596, 599-600, 366 A.2d 55, 58 (1976); Miller v. Norris Creameries, 311 Minn. 343, 345, 250 N.W.2d 161, 162 (1976); Harris v. National Truck Service, 56 Ala.App. 350, 354, 321 So.2d 690, 693-94 (1975); Miller v. Dunn Paper Co., 47 Mich.App. 471, 474, 209 N.W.2d 519, 521 (1973); Noffsker v. K. Barnett & Sons, 72 N.M. 471, 472, 384 P.2d 1022, 1023 (1963). Three of the jurisdictions cited by Hess have held in other contexts that workmen's compensation laws may be incorporated as terms of employment contracts. See DeMartino v. Zurich Insurance Co., 307 F.Supp. 571, 573 (W.D.Pa.1969), aff'd, 440 F.2d 1320 (3d Cir.1971); Matter of Injury to Spera, 713 P.2d 1155, 1156-57 (Wyo.1986); M.J. Daly Co. v. Varney, 695 S.W.2d 400, 403 (Ky.1985)
 
 
 [3]
 Under 1 V.I.C. Sec. 4,
 The rules of the common law, as expressed in the restatements of the law approved by the American Law Institute, and to the extent not so expressed, as generally understood and applied in the United States, shall be the rules of decision in the courts of the Virgin Islands in cases to which they apply, in the absence of local laws to the contrary.
 
 
 [4]
 The following cases hold that compensation laws are incidental to the contract and may be changed retroactively without effecting an unconstitutional impairment. K-Mart Corp. v. State Industrial Insurance System, 101 Nev. 12, 18-20, 693 P.2d 562, 565-67 (1985); Price v. All American Engineering Co., 320 A.2d 336, 339-40 (Del.1974); McAllister v. Bd. of Education, Town of Kearny, 79 N.J.Super. 249, 258-61, 191 A.2d 212, 217-18 (1963), aff'd., 42 N.J. 56, 198 A.2d 765 (1964); see also Kaiser Foundation Hospitals v. Workers' Compensation Appeals Bd., 87 Cal.App.3d 336, 349, 151 Cal.Rptr. 368, 376 (1978) ("liability under the Workmen's Compensation Act is incident to the status of employment and is neither in tort nor in contract"). Various courts have also held, in other contexts, that workmen's compensation laws are not contractual in nature. See Gaudet v. Exxon Corp., 562 F.2d 351 (5th Cir.1977), cert. denied, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978) (coverage of Longshoremen's and Harbor Workers' Compensation Act is not contractual); Jenkins v. Sal Chemical Co., 280 S.E.2d 243, 244 (W.Va.1981). The employees stress the statement in Cudahy Packing Co. of Nebraska v. Parramore, 263 U.S. 418, 423, 44 S.Ct. 153, 154, 68 L.Ed. 366 (1923), that "Workmen's Compensation legislation rests upon the idea of status, not that of implied contract." That was not a Contract Clause case, however, and the statement relied upon by the employees was directed only to the Court's conclusion that an employer could be liable under a state compensation statute for any injury causally related to employment rather than only for those injuries caused by the employer
 
 
 [5]
 We agree with the district court that there is no clear trend in either the "contract" or "status" direction that would compel a result in this case under 1 V.I.C. Sec. 4. Id. at 1223. See note 3 supra. Hess argues that the law of the Virgin Islands has already been determined to accept the contract analysis. It cites to Jensen v. McInerney, 299 F.Supp. 1309 (D.V.I.1969), in which our colleague, Judge Maris, sitting as a district court judge by designation, stated that, "As a statutory mandate upon the employer, [the provision of the Workmen's Compensation Act mandating coverage] was an implied term of the contract of employment." Id. at 1312 (footnote omitted). However, the issue in that case was whether the implied contract to insure could be a basis for jurisdiction and, therefore, although informative, that case is not dispositive
 
 
 [6]
 The Hess-Litwin contract provides:
 E. INDEMNIFICATION
 
 
 [1]
 Type I Work
 Where Type I work is involved, [Hess] shall defend, indemnify and hold [Litwin] harmless from any and all loss, damage, injury, liability, claim, demand, cause of action and judgment for personal injuries or death or for damage to or loss of property, excluding [Hess'] property, from any occurrence resulting from the performance of said work under this Agreement and shall furnish [Litwin] with a waiver of underwriters' rights of subrogation on any insurance it may carry against such risks.
 Nieves App. at 33-34.
 
 
 [7]
 The Hess-Litwin contract further provides:
 a. Type II Work
 Where Type II work is involved, from commencement of work by [Litwin] on each work assignment and until [Litwin] completes said work and the unit or part thereof on which the work has been performed has resumed normal operations for a period of thirty (30) days, [Litwin] shall defend, indemnify and hold [Hess] harmless from any and all loss, damage, injury, liability, claim, demand, cause of action and judgment for personal injuries or death or for damage to or loss of property, including [Litwin's] property, from any occurrence resulting from the performance of said work under this Agreement, unless caused by the sole negligence of [Hess]. Nieves App. at 34.
 
 
 [8]
 Although the dissent phrases Hess' argument as a contention that rights vested at the time of an employee's injury, Dissent at page 1256, instead its claim is that the contractual relationship between Hess and the employee at the time of injury presupposed that recovery for such injuries would be pursuant to the workmen's compensation scheme. At the time of injury, Hess had no reason to expect any retroactively applicable change to its reasonable expectation that workmen's compensation, rather than tort based law, would govern. The first legislative amendment growing out of the decision in Vanterpool, was enacted on October 19, 1984. All of the injuries in this suit occurred before that time. Thomas was injured on March 20, 1982; Scotland on May 23, 1983; Nieves on September 28, 1983; Prevost on December 5, 1983; Taylor on April 2, 1984; and Cotto on May 31, 1984
 
 
 [9]
 At oral argument before this court, Hess attempted to demonstrate its knowledge of and reliance on the borrowed employee doctrine by reference to its motions to raise that defense in other cases in the Virgin Islands beginning as early as August 4, 1982, several years before the Vanterpool decision. Inasmuch as Hess failed to raise this issue in the district court and to support it there with affidavits or documents, we will not consider it for the first time on appeal
 
 
 [10]
 For example, one of the principal sponsors of the bill explained it as follows:
 The "borrowed servant" doctrine was abolished by the Fifteenth Legislature. But now the court is saying that there is an additional type of employee called a "statutory employee." So that the Litwin employee is now being construed to be an employee of Hess. And that, as a matter of law, now is preventing the Litwin employee from suing Hess for negligence caused by a Hess employee.
 Transcript, Regular Session, 16th Legislature (Jan. 23, 1986) (statement of Senator Hodge), Nieves App. at 158.
 Another reference also makes it clear that the legislature intended the retroactive application provision to enable "the Division of Workmen's Compensation ... to recoup monies that it has expended on behalf of the injured employee from the party in this case, Hess, whose negligence caused the injury or injuries." Id.
 
 
 [11]
 At oral argument, counsel referred to one other similar pending case against Martin Marietta, and were aware of no other case raising the same issue
 
 
 [12]
 Although there are cases that suggest that a legislature's attempt to correct what it deems to be an erroneous judicial interpretation may justify a retroactive application of the curative legislation, nothing in these cases requires upholding retroactive application of curative legislation when retroactivity produces arbitrary and capricious results
 
 
 [1]
 Although it is irrelevant whether Hess pays for the borrowed employees' workers' compensation insurance, Hess pays only in the sense that Litwin undoubtedly uses revenues received from Hess to pay the insurance premiums, just as it undoubtedly uses revenues from Hess to pay the salaries of the employees, unemployment compensation premiums, and the like. The Weinman affidavit evidences no more than that Litwin had a "cost plus profit" contract with Hess. As we noted in the Vanterpool case,
 Borrowed employees, such as Vanterpool, who was borrowed by [Hess] from Litwin, remained on the Litwin payroll and Litwin made insurance premium payments to the statutory workers' compensation fund. See app. at 31. [Hess] in turn, reimbursed Litwin for all payroll expenses incurred for borrowed employees, including workers' compensation premiums. See app. at 104 (affidavit of Edward L. Weinman, Controller of [Hess]. This reimbursement was made by including the cost of procuring workers' compensation insurance as a factor in the scheduled time and materials rate paid to Litwin for borrowed employees. Id.
 Vanterpool v. Hess Oil Virgin Islands Corp., 766 F.2d 117, 120 (3d Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 801, 88 L.Ed.2d 777 (1986).
 
 
 [2]
 The Virgin Islands Act was based on Puerto Rico's workers' compensation law, which had been interpreted by the First Circuit in Colon Nunez v. Horn-Linie, 423 F.2d 952 (1st Cir.1970), to permit suits by borrowed employees against their borrowing employers. See Vanterpool, 766 F.2d at 124 & n. 10